**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION )<br><br>Plaintiff, )<br>v. )<br><br>OSF HEALTHCARE SYSTEM )<br><br><br>and )<br><br>ROCKFORD HEALTH SYSTEM )<br><br>Defendants. ) | No. 11-cv-50344<br><br>~~FILED UNDER SEAL~~ *unsealed by order dated 12-1-11* |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

The Federal Trade Commission ("FTC" or "Commission") petitions the Court, pursuant

to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), for a

temporary restraining order and preliminary injunction enjoining Defendants OSF Healthcare

System ("OSF") and Rockford Health System ("RHS"), including their agents, divisions,

parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating a merger,

acquisition, or consolidation pursuant to the definitive affiliation agreement, signed on January

31, 2011, whereby OSF is to acquire all of RHS's operating assets in the Rockford, Illinois

region. Absent the Court's action, OSF and RHS will be free to consummate the agreement after

11:59 pm on November 22, 2011. Plaintiff requires the aid of this Court to delay temporarily the

closing of the affiliation in order to prevent competitive harm and maintain the *status quo* during

the administrative proceeding, including a trial on the merits scheduled for April 17, 2012, that

1

the Commission initiated pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and the Commission's Rules of Practice. The ongoing administrative proceeding will determine the legality of the acquisition, subject to judicial review by a federal Court of Appeals, and will provide a forum for all parties to conduct full discovery and present evidence regarding the likely effects of the acquisition.

## I.

## NATURE OF THE CASE

1.      OSF's acquisition of RHS's assets (the "Acquisition") would substantially lessen competition for critical health care services in the Rockford, Illinois area. By ending decades of competition between OSF and RHS that has benefitted the community, the Acquisition threatens to increase total health care costs and reduce the quality of care and range of health care choices for employers and residents in the Rockford region.

2.      Congress vested the Commission with the authority and responsibility for determining the legality of acquisitions under Section 7 of the Clayton Act ("Section 7"). Thus, the Court in this matter "is not called upon to reach a final determination on the antitrust issues." Instead, the "one purpose of a proceeding under Section 13(b) is to preserve the *status quo* until the FTC can perform its function." Preliminary and temporary relief from this Court is necessary to prevent interim competitive harm, and to protect the ability of the Commission to order an effective remedy, at the conclusion of an administrative proceeding that already is underway to determine whether the Acquisition violates Section 7. Temporary relief from this Court is warranted if Plaintiff raises "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the [FTC] in the first instance, and ultimately by the Court of Appeals."

2

3.     Without temporary and preliminary injunctive relief from this Court, OSF will acquire RHS and be free to consolidate operations without limitation, for example terminating key staff, centralizing essential back office and administrative functions, eliminating or relocating clinical services, reviewing the most sensitive competitive information, and renegotiating contracts with commercial health plans. Such integration would irreversibly undermine the Commission's ability to order effective relief and restore competition if the Acquisition is deemed unlawful following the trial on the merits. Further, consummation of the Acquisition during the pending administrative proceeding will lead to immediate competitive harm, including higher health care costs and reduced health care choices for citizens of the Rockford region.

4.     The Acquisition, by Defendants' own admission, is a merger to duopoly in the Rockford region for general acute-care inpatient hospital services. The Acquisition will eliminate vigorous competition between OSF and RHS, and leave the Rockford region with only one other competitor for general acute-care inpatient hospital services: SwedishAmerican Health System ("SwedishAmerican").

5.     The Acquisition also will eliminate important competition for primary care physician services in the Rockford region by combining two of the three largest physician groups, and leave SwedishAmerican as the only other large hospital-employed physician group competitor in Rockford.

6.     The Acquisition will create a single dominant health system in the Rockford region, with the combined OSF/RHS controlling 64% of the general acute-care inpatient hospital services market and over 37% of the market for primary care physician services. The Acquisition will leave just two firms, OSF and SwedishAmerican, controlling 99.5% of the

3

general acute-care inpatient hospital services market and 58% of the market for primary care physician services.

7.    Within the confines of a limited Section 13(b) hearing – and even at the full administrative trial on the merits – the Acquisition is presumptively unlawful. Under the relevant case law and the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), post-acquisition market shares and concentration levels in the market for general acute-care inpatient hospital services in the Rockford region are extraordinarily high. The likelihood of anticompetitive effects arising from the Acquisition, including increased reimbursement rates stemming from the creation of a dominant health system, is independently supported and confirmed by evidence from sources including health plans, local employers and physicians, third party hospitals, and the merging parties themselves.

8.    Rockford region employers and their employees would bear the costs – either directly or through higher health insurance premiums, co-pays, and other out-of-pocket health care expenses – of the rate increases likely to result from the Acquisition. Such health care cost increases force employers to reduce or eliminate health insurance benefits, force families to drop their health insurance altogether, and force some patients to delay or forego medical care that they can no longer afford.

9.    The Acquisition also would diminish the quality of care, range of health care choices, patient experience, and access to care for Rockford region residents by ending decades of important non-price competition between OSF and RHS, and by reducing the incentive for OSF and SwedishAmerican to compete aggressively post-acquisition.

10.    The price and non-price competition eliminated by the Acquisition would not be replaced by other providers. SwedishAmerican is the only other hospital that meaningfully

4

competes for Rockford region patients, and significant barriers to entry and expansion, including regulatory requirements and substantial up-front costs, prevent new hospitals from entering the market.

11.      The fact that the merged entity would still face at least some competition from one meaningful competitor, SwedishAmerican, is not sufficient to render the Acquisition lawful under Section 7. This conclusion is compelled by the antitrust laws – which condemn more than just mergers to monopoly – and also by the market realities in the Rockford region. Specifically, after the Acquisition, the merged system will be a virtual "must-have" for health plans seeking to offer insurance to Rockford employers and employees. This fact – and the greater leverage the merged firm will enjoy as a result – stems from the inability of commercial health plans after the Acquisition to offer an attractive provider network without contracting with the combined system.

12.      Health plans must offer at least two of the Rockford hospitals to be marketable to local residents. As a result, every major health plan network in the Rockford region includes two, but not all three, of the Rockford hospitals. After the Acquisition, no health plan could continue to offer a multi-hospital network in Rockford without facing the substantially higher rates that will be demanded by the merged OSF and RHS.

13.      The Acquisition also increases the incentive and ability for the only remaining competitors in Rockford, SwedishAmerican and OSF, to engage in anticompetitive coordinated behavior. Such coordination could include directly or indirectly sharing sensitive information related to commercial health plan contracts and negotiations, or it could involve deferring competitive initiatives that otherwise would benefit the Rockford community.

14.      The Acquisition will substantially lessen competition and greatly enhance

5

Defendants' market power, and therefore raises serious and substantial questions regarding the likelihood of anticompetitive effects. Defendants' speculative efficiency and quality-of-care claims are insufficient to offset the significant anticompetitive harm likely to result from the Acquisition.

15.     Plaintiff has met and exceeded its burden to raise serious and substantial questions about the legality of the Acquisition under Clayton Act Section 7. Temporary and preliminary injunctive relief is imperative to prevent interim harm to competition and consumers in Rockford, and to preserve the *status quo* and protect the Commission's ability to order effective relief if the Acquisition is deemed illegal in the ongoing full administrative proceeding.

## II.

## BACKGROUND

### A.

### Jurisdiction and Venue

16.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and upon 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States. OSF and RHS, and their relevant operating subsidiaries, are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

17.     OSF and RHS transact business in the Northern District of Illinois and are subject to personal jurisdiction therein. Venue therefore is proper in this district under 28 U.S.C. § 1391 (b) and (c) and 15 U.S.C. § 53(b).

18.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

6

(b)     Whenever the Commission has reason to believe –

> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .

## B.

## The Parties

19.     The Commission is an administrative agency of the U.S. Government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18.

20.     Defendant OSF is a not-for-profit health care system incorporated under and by virtue of the laws of Illinois. OSF is headquartered in Peoria, Illinois. OSF owns and operates six acute care hospitals in Illinois, and a seventh hospital in northwestern Michigan. In Rockford, OSF operates St. Anthony Medical Center ("OSF St. Anthony"), which has 254 licensed beds and serves the Rockford region. OSF also owns and operates OSF St. Anthony's employed physician group, OSF Medical Group ("OSFMG"), which employs approximately 80

7

physicians in the Rockford region. During fiscal year 2010, OSF generated $1.7 billion in operating revenue, with OSF St. Anthony generating approximately $325 million of that total.

21.     Defendant RHS is a not-for-profit health care system incorporated under and by virtue of the laws of Illinois. RHS is headquartered in Rockford, Illinois. RHS owns and operates one acute care hospital, Rockford Memorial Hospital ("Rockford Memorial"), which is located in Rockford, Illinois and serves the Rockford region. Rockford Memorial has 396 licensed beds. RHS also owns and operates Rockford Health Physicians ("RHPH"), which employs approximately 160 physicians in the Rockford region. During fiscal year 2010, RHS generated $441 million in operating revenue.

## C.

### Employers and Health Plans

22.     Competition between hospitals occurs in two "stages." In the first stage, hospitals compete to be selected as in-network providers by health plans. To become an in-network provider, a hospital engages in bilateral negotiations with the health plan. Hospitals benefit from in-network status by gaining access to the health plan's members as patients. Health plans seek to create provider networks with geographic coverage and a scope of services sufficient to attract and satisfy employers and their employees. One of the critical terms that a hospital and a health plan agree upon during a negotiation is the reimbursement rates that the health plan will pay to the hospital when the health plan's members obtain care at the hospital's facilities or from its employed physicians.

23.     Fully-insured employers and their employees pay premiums, co-pays, and deductibles in exchange for access to a health plan's provider network and for insurance against the cost of future care. The costs to employers and health plan members are inextricably linked

8

to the reimbursement rates that health plans negotiate with each health care provider in their provider network. Self-insured employers have access to their health plan's network and negotiated reimbursement rates but assume all risk for the costs of care provided to their employees. Self-insured employers must pay the entirety of their employees' health care claims and, as a result, they immediately and fully incur any hospital rate increases. Therefore, regardless of whether an employer is fully-insured or self-insured, its health plan acts as its agent – and by extension acts on behalf of its employees – in creating provider networks that offer convenience, high quality of care, and negotiated reimbursement rates.

24.     In the second stage of competition, hospitals and their employed physicians compete with other in-network providers to attract patients. Health plans typically offer multiple in-network hospitals with similar out-of-pocket costs and those hospitals compete in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer.

## D.

### The Acquisition and the Commission's Response

25.     Under the terms of the affiliation agreement signed on January 31, 2011, OSF will acquire all operating assets of RHS and become the sole corporate member of RHS. OSF will hold reserve powers over the governance and operations of RHS. OSF's reserve powers will grant it control and ultimate authority over all significant business decisions of RHS, including strategic planning, operating and capital budgets, large capital expenditures, and significant borrowing and contracting. Absent this Court's action, OSF and RHS will be free to close the Acquisition after 11:59 p.m. on November 22, 2011.

9

26. On November 17, 2011, by a unanimous vote, the Commission found reason to believe that the Acquisition would violate Section 7 of the Clayton Act by substantially reducing competition in two lines of commerce, and initiated an administrative proceeding. A plenary administrative trial on the merits of the Acquisition will begin on April 17, 2012. After an initial decision by an Administrative Law Judge ("ALJ"), the Commission will determine the legality of the Acquisition under Section 7 of the Clayton Act, and order an appropriate remedy if it finds liability. Under Section 11(c) of the Clayton Act, 15 U.S.C. § 21(c), OSF or RHS may appeal an adverse Commission decision directly to any U.S. Court of Appeals within whose jurisdiction OSF or RHS resides or conducts business.

27. Also on November 17, 2011, the Commission authorized this federal court proceeding under Section 13(b) of the FTC Act. This action seeks to enjoin consummation of Defendants' affiliation pending resolution of the Commission's administrative proceeding, and any appeals, in order to minimize interim harm to competition and preserve the Commission's ability to order adequate relief and restore competition if it concludes that the Acquisition is unlawful.

### E.

### This Court's Prior Holding that the
### Merger of Two Rockford Hospitals Would Violate the Antitrust Laws

28. This Court found in 1989 that the proposed merger of Rockford Memorial and SwedishAmerican violated Section 7 of the Clayton Act. After holding a full trial on the merits, this Court issued a permanent injunction to stop the merger and the U.S. Court of Appeals for the Seventh Circuit, in a decision written by Judge Posner, affirmed this Court's finding of liability and upheld the permanent injunction.

29.     Plaintiff today asks this Court only for limited interim relief – in the form of a

preliminary, not permanent, injunction – to maintain the *status quo* during an administrative trial

that will determine whether the Acquisition violates Section 7.  In contrast to the 1989

proceeding, this Court is not tasked with determining the ultimate legality of OSF's acquisition

of RHS.  Instead, this Court's only role is to assess the need for limited interim relief provided

under Section 13(b) of the FTC Act.

30.     In carrying out its limited role, this Court must preliminarily assess the FTC's

ultimate likelihood of success on the merits after a full administrative trial.  The Court's

*permanent* injunction blocking Rockford Memorial's proposed merger with SwedishAmerican in

1989 is informative of the FTC's likelihood of success on the merits and supports the request for

*preliminary* relief in this case.

31.     In the 1989 case, this Court defined a relevant geographic market identical to the

market alleged by Plaintiff in this Complaint.  This Court also defined a relevant product market

– general acute-care hospital inpatient services – identical to a market alleged by Plaintiff in this

Complaint.  In fact, this Court described a market structure, levels of market concentration, and

entry conditions in the earlier case that are strikingly similar to those alleged in this Complaint

and, on that basis, concluded that the merger of two Rockford hospitals would "produce a firm

controlling an undue percentage share of the relevant market, thus increasing the likelihood of

market dominance by the merged entity or collusion."

32.     Following a full hearing on the merits, and on facts very similar to the facts

alleged in this case, this Court issued a permanent injunction blocking the merger of two of the

three Rockford hospitals.  Given that the only meaningful difference between the 1989 merger

and the Acquisition is the re-shuffling of the parties to the transaction, Plaintiff's request for a

11

*preliminary* injunction is undoubtedly appropriate under Section 13(b)'s "serious, substantial" questions standard.

## III.

## THE RELEVANT SERVICE MARKETS

### A.

### General Acute-Care Inpatient Services Market

33.    The Acquisition threatens substantial harm to competition in the market for general acute-care inpatient hospital services sold to commercial health plans ("general acute-care services").  General acute-care services encompass a broad cluster of medical and surgical diagnostic and treatment services that include an overnight hospital stay, including, but not limited to, many emergency services, internal medicine services, and surgical procedures.  It is appropriate to evaluate the Acquisition's likely effects across this entire cluster of services, rather than analyzing each inpatient service independently, because the group of services is offered to Rockford region residents by the same set of competitors and under similar competitive conditions.

34.    The general acute-care services market does not include outpatient services (those not requiring an overnight hospital stay) because such services are offered by a different set of competitors under different competitive conditions.  Further, health plans and patients could not substitute outpatient services for inpatient services in response to a price increase.  Similarly, the most complex and specialized tertiary and quaternary services, such as certain major surgeries and organ transplants, also are not part of the relevant cluster of services because they generally are not available in the Rockford region, are offered by a different set of suppliers under different competitive circumstances, and are not substitutes for general acute-care services.

12

35.     This Court defined the same general acute-care services market in its 1989

opinion.  In a 2011 order, the U.S. District Court for the Northern District of Ohio, in analyzing a

hospital merger challenge, also accepted this precise product market definition.

## B.

### Primary Care Physician Services

36.     The Acquisition also threatens substantial competitive harm in the market for

primary care physician services provided to commercially-insured adults.  This market

encompasses services offered by physicians practicing in internal medicine, family practice, and

general practice.  This relevant market does not include physician services provided by

pediatricians because they typically treat only patients eighteen years old and younger.  This

relevant market also excludes physician services provided by obstetricians and gynecologists

("OB/GYN") because those services generally complement, rather than substitute for, general

primary care physician services.

## IV.

### THE RELEVANT GEOGRAPHIC MARKET

37.     The relevant geographic market in which to analyze the effects of the Acquisition

in the general acute-care inpatient hospital services market is no broader than the geographic

market defined by this Court in its 1989 opinion: an area encompassing all of Winnebago

County, essentially all of Boone County, the northeast portion of Ogle county, and single zip

codes in McHenry, DeKalb, and Stephenson counties (previously referred to by this Court as the

"Winnebago-Ogle-Boone" market).  Today, as was the case in 1989, this relevant geographic

market accounts for 87% of the inpatient admissions of the merging parties.  Notably, and in

contrast to other previous hospital mergers, the precise contours of the relevant geographic

13

market do not alter in any meaningful way the number of competitors, the market share statistics, or the ultimate conclusion that the Acquisition is likely to lead to competitive harm.

38.     The appropriate geographic market is determined by examining the geographic boundaries within which a hypothetical monopolist for the services at issue could profitably raise prices by a small but significant amount.

39.     Rockford region residents have a clear preference for obtaining hospital care and primary care physician services locally. As a result, health plans must include hospitals and primary care physicians from the Rockford region in their provider networks in order to meet their members' needs. Patients do not and would not go to hospitals or primary care physicians outside of the Rockford region in response to rate increases within the region. Thus, a hypothetical monopolist that controlled all of the hospitals or all of the primary care physicians in the Rockford region could profitably increase rates by at least a small but significant amount.

40.     In the ordinary course, OSF and RHS treat only their Rockford counterparts as meaningful competitors, and both hospitals focus their competitive efforts on providers located in Rockford. OSF and RHS define their primary service areas no broader than the Winnebago-Ogle-Boone area. Patient draw data maintained in the ordinary course by both OSF and RHS indicates that nearly all of their inpatients originate from the Winnebago-Ogle-Boone area.

41.     The relevant geographic market in which to analyze the market for primary care physician services provided to commercially-insured adults is similarly no broader than the Winnebago-Ogle-Boone area defined by this Court in 1989, and may be significantly more narrow. Patients are no more willing to travel to obtain primary care services than they are to obtain acute-care inpatient hospital services. Indeed, because patients generally obtain primary

14

care services much more frequently than acute inpatient hospital services, their preference for access to local providers is significantly stronger.

## V.

## MARKET STRUCTURE AND THE ACQUISITION'S PRESUMPTIVE ILLEGALITY

### A.

### General Acute-Care Inpatient Services Market

42.     The Acquisition will reduce the number of general acute-care hospital competitors in the Rockford region from three to two, creating a duopoly of OSF and SwedishAmerican.[1]

43.     The Acquisition is presumptively unlawful by a wide margin under the relevant case law and the Merger Guidelines because it would significantly increase concentration in the already highly concentrated market for general acute-care services in the Rockford region.

44.     OSF's post-Acquisition market share in the general acute-care services market will be 64% (as measured by patient days), easily surpassing levels held to be presumptively unlawful by the Supreme Court.  Moreover, the Acquisition would leave just two hospitals, OSF and SwedishAmerican, in control of 99.5% of the Rockford region market for general acute-care services.

45.     As described in the Merger Guidelines, the standard for measuring market

---

[1] The only other provider within the relevant geographic market, Rochelle Community Hospital ("Rochelle"), is located in Rochelle, Illinois, a small community 30 miles (over 40 minutes driving time) south of Rockford.  As this court held previously, and the evidence continues to show, Rochelle is not competitively relevant to Rockford and its three hospitals.  Rochelle's market share in the Rockford region is less than one half of one percent.  It is a 25-bed critical access facility that offers a very limited range of services, is prohibited by the state from expanding its capacity, and serves its immediate community almost exclusively.

concentration is the Herfindahl-Hirschman Index ("HHI"). A merger or acquisition is likely to create or enhance market power, and is presumed illegal, when the post-acquisition HHI exceeds 2500 points and the acquisition would increase the HHI by more than 200 points. Here, the general acute-care services market concentration levels drastically exceed these thresholds. The Acquisition would, as shown below, increase the HHI from 3319 to 5351, a change of 2032 points.

46.     In its prior decision, this Court found that the merger of two Rockford hospitals resulting in concentration figures similar to those resulting from this Acquisition "would produce a firm controlling an undue percentage share of the relevant market, thus increasing the likelihood of market dominance by the merged entity or collusion." Notably, the Rockford region is even more concentrated today than it was in 1989, due to the lack of new hospital entry, the closure of one hospital, and the acquisition of another by SwedishAmerican.

| GENERAL ACUTE-CARE INPATIENT SERVICES | | |
|---|---|---|
| **Hospital/System** | **Pre-Acquisition Market Share** | **Post-Acquisition Market Share** |
| SwedishAmerican | 35.6% | 35.6% |
| RHS | 34.3% | – |
| OSF | 29.6% | 63.9% |
| Rochelle | 0.5% | 0.5% |
| **Pre-Acquisition HHI** | | 3319 |
| **Post-Acquisition HHI** | | 5351 |
| **HHI Increase** | | 2032 |

16

**B.**

**Primary Care Physician Services Market**

47.     The Acquisition will reduce the number of hospital-employed physician groups from three to two in the Rockford region, and leave the remainder of the market highly fragmented with small independent physician practices.  Under the relevant case law and the Merger Guidelines, the Acquisition raises significant competitive concerns in the primary care physician services market.

48.     The Acquisition will result in a concentrated primary care physician services market with few significant competitors.  Based on the best currently-available data, OSF's post-Acquisition market share will exceed 37%.  Post-Acquisition, the two remaining hospitals, OSF and SwedishAmerican, will control over 57% of the primary care physician services market in the Rockford region.

49.     Under the Merger Guidelines, a merger or acquisition potentially raises significant competitive concerns that warrant scrutiny when the post-merger HHI exceeds 1500 points and the merger or acquisition increases the HHI by more than 100 points.  Here, the post-Acquisition HHI in the primary care physician services market exceeds these levels by a wide margin, with an increase of 696 points to 1925.  The HHI figures for the primary care physician services market are summarized in the table below.

| PRIMARY CARE PHYSICIAN SERVICES* | | |
|---|---|---|
| **Hospital/System** | **Pre-Acquisition Market Share** | **Post-Acquisition Market Share** |
| SwedishAmerican | 20.4% | 20.4% |
| OSFMG | 19.9% | 37.4% |
| RHPH | 17.5% | – |
| University of Illinois | 7.3% | 7.3% |
| Others** | 4.0% | 4.0% |
| Independent*** | 30.9% | 30.9% |
| **Pre-Acquisition HHI** | | 1229 |
| **Post-Acquisition HHI** | | 1925 |
| **HHI Increase** | | 696 |

\* Due to limitations in the preliminarily-available data, the primary care physician market shares and HHIs have been calculated on the basis of full-time-equivalent physicians practicing in a geographic market comprising Winnebago, Boone, and Ogle counties, which has a slightly different scope than the geographic market defined by this Court in 1989.
\*\* includes several small and mid-size physician groups
\*\*\* all independent physicians are treated as individual providers in HHI calculations

## VI.

## ANTICOMPETITIVE EFFECTS

### A.

#### Loss of Price Competition And the Increased Bargaining Leverage of OSF

50.     The Acquisition will end decades of significant competition between Defendants and will increase Defendants' ability and incentive to unilaterally demand higher reimbursement rates from commercial health plans.

51.     Today, the three Rockford hospitals are close and vigorous competitors in the markets for general acute-care services and primary care physician services. There is nearly

complete overlap in the service areas of OSF, RHS, and SwedishAmerican. Rockford region residents and, by extension, the health plans that represent them, consider all three Rockford hospitals as close substitutes for one another due to their proximity and similar scope of services. Residents benefit from the competition between the three hospitals.

52.     Rockford residents strongly prefer to have a choice of where they receive their health care services. As a result, every major health plan serving the Rockford region features a provider network with two of the three local hospitals as preferred providers. While health plans and their members might prefer to have access to all three Rockford hospitals, the hospitals provide discounts to health plans for contracting with only two Rockford hospitals.

53.     Currently, the three Rockford hospitals must compete vigorously – often through a competitive bidding process – to be included in each health plan's provider network. Due to the similarity and close substitutability of the three Rockford hospitals, health plans today believe they can build a marketable network with any two of the hospitals. As a result, the three Rockford hospitals compete for just two spots in each health plan's network, each hospital being forced to provide competitive rates or else risk exclusion from a health plan's network.

54.     Nothing about the Acquisition will change the high value and importance that Rockford residents place on being able to choose their doctors and hospitals. Residents will continue to demand health plan provider networks that include at least two of the three Rockford hospitals, as they have for decades.

55.     After the Acquisition, no health plan will be able to offer its members access to more than one of the Rockford hospitals without first agreeing to whatever terms the merged OSF and RHS may demand. As a result, the merged system will become even more important to health plans serving the Rockford region and thus become a virtual "must have." Health plans

will no longer be able to play the three Rockford hospitals against one another. They will have to choose between contracting only with SwedishAmerican, which would restrict their members' choices and options, or accepting significantly higher reimbursement rates demanded by the newly dominant OSF.

56.     Any increase in rates ultimately will be borne by the employers and residents of Rockford through increased insurance premiums and health care costs. The majority of commercially insured patients in the Rockford region are covered by health plans that are self-insured by their employers. Self-insured employers pay the full cost of their employees' health care claims and, as a result, they immediately and directly bear the full burden of higher rates charged by hospitals or physicians. Fully-insured employers also are inevitably harmed by higher rates, because health plans pass on at least a portion of hospital rate increases to these customers.

57.     Employers, in turn, will pass on their increased health care costs to their employees, in whole or in part. Employees will bear these costs in the form of higher premiums, higher co-pays, reduced coverage, or restricted services. Some Rockford region residents will forgo or delay necessary health care services because of the higher costs, and others may drop their insurance coverage altogether.

58.     OSF could also exercise its newly acquired market power after the Acquisition by preventing health plans from including SwedishAmerican in their provider networks. The effect would be to eliminate entirely the ability of Rockford residents who want access to either OSF or RHS from also utilizing SwedishAmerican without incurring higher out-of-network costs. In Peoria, a market south of Rockford where OSF is already a self-acclaimed "dominant player,"

20

OSF has successfully leveraged its market position to exclude its primary competitor from key health plans.

59.    Defendants' documents created in the ordinary course of business indicate that the managed care strategies of the parties encourage "capturing market share," with the ultimate goal to "build leverage" and become a "must have" system to health plans. Party executives concede that one motivation for the Acquisition was "to become bigger, to at least reclaim some leverage" against the health plans.

60.    Although SwedishAmerican will continue to act as a meaningful competitor in the Rockford region, the presence of SwedishAmerican will not prevent a post-Acquisition exercise of market power by OSF – whether it is in the form of a rate increase or exclusionary conduct. Because Rockford residents demand health plan networks that offer at least two Rockford hospitals, a network comprised exclusively of SwedishAmerican would be highly undesirable to employers and thus unlikely to have commercial success. Recent history confirms this: virtually every attempt by a health plan to market a provider network consisting of just one Rockford hospital – including one exclusive to SwedishAmerican – has failed.

61.    The Acquisition also will significantly increase OSF's ability to unilaterally increase rates for primary care physician services. Hospitals and health plans engage in bilateral negotiations to create networks of physicians much like they do to create networks of hospitals. Similar competitive factors dictate the outcomes of negotiations over physician services as dictate the outcomes of negotiations over hospital services. As is the case with the three Rockford hospitals, Rockford residents consider the primary care physician groups of the three local hospitals as close substitutes for each other. Therefore, the Acquisition will strengthen

21

OSF's bargaining leverage against health plans when it is negotiating the terms of including

OSFMG and RHPH physicians in the health plans' provider networks.

**B.**

**The Acquisition will Reduce Competition Over Quality, Service, and Access**

62.     Residents of the Rockford region have benefitted from decades of competition

between OSF and RHS to improve the quality of care, increase the scope of services, and expand

access to care in the Rockford region.  The Acquisition would end this important non-price

competition between OSF and RHS and reduce the quality, convenience, and breadth of services

local residents would otherwise enjoy.

63.     After decades of Defendants' self-described "heavy competition," all three

Rockford hospitals today offer convenient access to a broad range of high quality clinical

services.  And despite the costs incurred to invest in new technologies and improve the quality of

care over the years, all three Rockford hospitals have been, and continue to be, financially stable

organizations with positive operating performances and substantial cash reserves.

64.     RHS, described as a "first mover" and "market disrupter" when it comes to

expanding its services or improving its technology, repeatedly spurred OSF and

SwedishAmerican to respond by upgrading their own offerings.  The Acquisition would

eliminate RHS as an independent competitor in the Rockford region and would thereby eliminate

a competitive force behind much of the innovation and expansion that has benefitted local

residents over the years.

## C.

## The Acquisition Will Increase the Incentive and Ability to Coordinate

65.     The Acquisition also will diminish competition by enabling and encouraging OSF and its sole remaining competitor in the Rockford region, SwedishAmerican, to engage in coordinated interaction.

66.     As the Seventh Circuit held in affirming the Commission's divestiture order in a prior hospital merger matter: "[t]he fewer the independent competitors in a hospital market, the easier they will find it, by presenting an unbroken phalanx of representations and requests, to frustrate efforts to control hospital costs."

67.     According to the Merger Guidelines, coordination need not rise to the level of explicit agreement. It may involve a "common understanding that is not explicitly negotiated[,]" or even merely "parallel accommodating conduct not pursuant to a prior understanding."

68.     The market structure and competitive dynamics in the Rockford region today are materially unchanged since this Court found in 1989 that a merger of two of the Rockford hospitals would facilitate the likelihood of collusion among the two remaining hospital competitors. The acquisition of RHS by OSF, the latest proposed merger to duopoly in the Rockford region, is no less likely to result in coordinated interaction.

69.     OSF and SwedishAmerican would have the incentive and ability to coordinate their managed care contracting strategies post-Acquisition, for example, by communicating confidential information related to health plan negotiations, either by directly contacting each other or by otherwise signaling their intentions. The two remaining hospitals could also defer competitive initiatives, such as adding amenities or expanding services, which would otherwise benefit Rockford residents. Indeed, Defendants' ordinary course documents suggest that

23

hospital executives in the Rockford region communicate directly and indirectly in order to exchange sensitive information about strategic initiatives and health plan negotiations.

## VII.

## ENTRY BARRIERS

70.     Neither hospital entry nor expansion by the sole remaining hospital competitor will deter or counteract the Acquisition's likely harm to competition in the relevant service markets.

71.     New hospital entry or significant expansion in the Rockford region is unlikely to occur because Illinois' Certificate of Need ("CON") statute requires an extensive application process in order to construct a hospital, add acute care beds or new clinical services to an existing hospital, or to purchase medical equipment above a capital threshold. The CON approval process is focused on the number of hospital beds per capita; the process does not contemplate or permit consideration of antitrust or competition concerns. Based on the most recent findings of the Illinois Health Facilities and Services Review Board responsible for reviewing CON applications, any request to construct a new acute care hospital in the Rockford region is likely to be denied because the board does not believe Rockford needs any additional beds.

72.     Even if new hospital entry did occur in the Rockford region, such entry would not be timely because it would take at least two to five years from the planning stages to opening doors to patients. New entry is also unlikely to be sufficient to deter or counteract the anticompetitive effects of the Acquisition because a new hospital would need to be able to replicate and offer a broad cluster of general acute-care inpatient services comparable to those offered by OSF and SwedishAmerican.

24

73.     New primary care physician entry is unlikely because most physicians in Rockford are already employed by one of the three hospitals.  Further, the number of independent primary care physicians is declining because hospitals offer stability and generous benefits, while self-managing a private physician practice is costly and time-consuming.  As a result, there has been very little to no entry of independent primary care physicians into the Rockford region in the last several years.

74.     New competition from currently-employed Rockford physicians who leave to open a private practice is unlikely to occur, and in any event would not be timely to deter or prevent competitive harm, in part because all three Rockford hospitals require their employed physicians to sign non-compete agreements that prohibit them from practicing in or around Rockford for at least two years.

## VIII.

## EFFICIENCIES

75.     Defendants' alleged benefits of the Acquisition fall well short of the substantial, merger-specific, well-founded, and competition-enhancing efficiencies that would be necessary to outweigh the Acquisition's significant harm to competition in Rockford.  No court ever has found, without being reversed, that efficiencies rescue an otherwise illegal transaction.  Relevant case law indicates that "extraordinary" efficiencies are required to justify an acquisition, such as this one, with vast potential to harm competition.  A full administrative proceeding already is underway, which will afford Defendants a full opportunity to litigate such issues should this Court grant the requested preliminary relief.

76.     The alleged efficiencies are unfounded and unreliable. Defendants have refused to answer questions or reveal underlying data and analysis in support of their claims on the grounds

that such material was prepared under the direction of antitrust counsel in anticipation of litigation, and thus constitutes attorney work product. The made-for-litigation efficiency claims, therefore, were unambiguously "generated outside of the usual business planning process." Even an analysis based on the information available to date reveals that Defendants' efficiency claims are speculative, exaggerated, and contradicted by the testimony of party executives.

77.     Many of the alleged efficiencies also are not merger-specific because they could be accomplished unilaterally without any merger or acquisition, or through an affiliation with an alternative purchaser. The same litigation consultants who generated the estimates of the savings that may result from the Acquisition produced two separate reports detailing tens of millions of dollars in annual savings that RHS and OSF could accomplish on their own.

78.     Any claim that the Acquisition is necessary for the parties to survive or continue to compete as full-service independent hospitals is speculative and unsupported by market realities. In fact, RHS and SwedishAmerican made similar claims to this Court in 1989, and OSF and SwedishAmerican repeated them again during an effort to merge in 1997. Despite their repeated dire predictions, OSF, RHS, and SwedishAmerican have continued to compete successfully over the course of the last two decades and, today, each remains a financially stable, full-service hospital providing high-quality care to the community.

## IX.

## LIKELIHOOD OF SUCCESS ON THE MERITS AND NEED FOR RELIEF

79.     In deciding whether to grant relief, this Court must balance the likelihood of the Commission's ultimate success on the merits against the equities, using a sliding scale. The principal equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws. Equities affecting only Defendants cannot tip the scale.

80.     Plaintiff's Complaint raises questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance, and ultimately by the Court of Appeals.

81.     Having reason to believe that the Acquisition would violate Section 7 of the Clayton Act, the Commission voted unanimously to issue an administrative complaint alleging, among other things, that:

    a.    The Acquisition would have anticompetitive effects in the general acute-care inpatient services and primary care physician services markets in the Rockford region of Illinois;

    b.    Substantial and effective entry or expansion into these markets is difficult, and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition; and

    c.    Efficiencies that Defendants assert may result from the Acquisition are speculative, not merger-specific, and are, in any event, insufficient as a matter of law to justify the Acquisition.

82.     Should the Commission rule, after the full administrative trial, that the Acquisition is unlawful, reestablishing the *status quo ante* of competition would be difficult, if not impossible, in the absence of preliminary injunctive relief from this Court. Congress enacted Section 13(b) specifically to preserve the Commission's ability to order effective, final relief after an administrative proceeding. The integration of RHS's operations with OSF, including staff reductions, centralization of essential back-office and administrative functions, the elimination or transfer of clinical service lines, and the implementation of higher contractual rates with health plans, would significantly impair any attempt to restore competition to pre-

27

Acquisition levels.

83.     Moreover, in the absence of relief from this Court, substantial harm to competition would occur in the interim – including an increase in the costs that Rockford employers and their employees incur for their health care and the elimination or relocation of clinical services – even if suitable divestiture remedies ultimately could be devised. Because there is no evidence that the significant interim harm to competition and consumers will be outweighed by substantial pro-competitive benefits of the Acquisition, the public equities weigh strongly in favor of Plaintiff's request for preliminary injunctive relief.

84.     Private equities affecting Defendants are insufficient to outweigh the significant public equities at risk if preliminary relief is not granted by this Court. Further, in this case, there exists no urgency to close the Acquisition, and Defendants cannot credibly assert that the ongoing administrative proceeding will cause harmful delay. Over the last several years, the parties have engaged in a drawn out process of affiliation discussions and negotiations. During this time, they hired at least three different consultants to analyze the transaction and spent seven months conducting due diligence. Eight months passed between signing a letter of intent and executing the affiliation agreement on January 31, 2011. The parties waited another seven months to respond to the FTC's request for documents, and to start the 30-day statutory clock leading to this filing. According to the terms of the executed affiliation agreement, the closing of the Acquisition is not subject to a break-up fee or any contingency financing. Also, OSF and RHS – both financially healthy and stable organizations – are in no danger of financial harm if closing is delayed.

85.     The FTC's administrative trial on the merits will begin on April 17, 2012, before Administrative Law Judge Chappell. A similar proceeding, also involving a hospital merger,

recently concluded before the same court. On March 29, 2011, the U.S. District Court for the Northern District of Ohio granted a preliminary injunction in a Section 13(b) proceeding to prevent the full consolidation of two hospitals and to "preserve the FTC's ability to achieve meaningful relief, if it succeeds on the merits[.]" In that case, the FTC's merits trial – before Administrative Law Judge Chappell – started on schedule and proceeded without delay, with closing arguments being heard less than nine months after the FTC filed its motion for temporary relief in federal district court, and only six months after the district court issued its preliminary injunction. Similarly here, by granting Plaintiff's request for limited relief, this Court will not impose a significant delay on the Acquisition were it to be ultimately deemed lawful at the merits trial.

86.     Accordingly, the equitable relief requested here is in the public interest.

WHEREFORE, Plaintiff respectfully requests that the Court:

    a.     Temporarily restrain and preliminarily enjoin OSF from taking any steps to integrate, consolidate, or combine its operations with those of RHS, consistent with Plaintiff's proposed Order;

    b.     Retain jurisdiction and maintain the *status quo* until resolution of the administrative proceeding that the Commission has initiated; and

    c.     Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: November 18, 2011                Respectfully submitted,


MATTHEW J. REILLY
JEFFREY H. PERRY
KENNETH W. FIELD
Attorneys
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., N.W.
Washington D.C. 20580
Telephone: (202) 326-2350
Facsimile (202) 326-2286
Email: mreilly@ftc.gov

RICHARD A. FEINSTEIN
Director
NORMAN A. ARMSTRONG, JR.
Deputy Director
Federal Trade Commission
Bureau of Competition

WILLARD K. TOM
General Counsel
Federal Trade Commission

*Attorneys for Plaintiff Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of November, 2011, I filed the foregoing with the clerk of the court.

*Monica Mallory /ser*

Monica V. Mallory
Assistant United States Attorney
U.S. Attorney's Office, Rockford

I HEREBY CERTIFY that on the 18th day of November, 2011, I served the foregoing on the following counsel via electronic mail:

Alan I. Greene
Hinshaw & Culbertson LLP
222 North LaSalle Street
Suite 300
Chicago, IL 60601
Email: agreene@hinshawlaw.com
Phone: (312) 704-3536

*Counsel for OSF Healthcare System*

David Marx, Jr.
McDermott Will & Emery
227 West Monroe Street
Chicago, IL  60606-5096
Email: dmarx@mwe.com
Phone: (312) 984-7668

*Counsel for Rockford Health System*

Matthew J. Reilly
Attorney for Plaintiff Federal Trade Commission

31