## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 50344 |
| | ) | |
| OSF HEALTHCARE SYSTEM, and | ) | |
| ROCKFORD HEALTH SYSTEM | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

FREDERICK J. KAPALA, District Judge:

Currently before the court is a motion by plaintiff, the Federal Trade Commission ("FTC"),

pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for a preliminary injunction enjoining

defendants, OSF Healthcare System ("OSF") and Rockford Health System ("RHS"), from

consummating their affiliation agreement executed on January 31, 2011, or otherwise acquiring each

other's assets or interests. After a thorough review, the court grants the FTC's motion and will order

the parties to maintain the status quo and not proceed with the proposed merger until such time as

the FTC has concluded its administrative trial on the merits of the underlying antitrust claims.

## I. BACKGROUND[1]

Defendant OSF is a not-for-profit health care system that owns and operates several acute

care hospitals in Illinois, including St. Anthony Medical Center ("SAMC") in Rockford, Illinois.

---

[1]Citations to the record are indicated in one of three ways: (1) documents already on file with the court are cited as "Doc." followed by the docket number and any further pinpoint citation; (2) references to testimony from the evidentiary hearing are cited as "Tr." followed by the specific page number(s); and (3) exhibits are cited by reference to their marked number and, where applicable, further pinpoint citation to the specific page, paragraph, or section.

PX2501 ¶ 17.   Defendant RHS is a not-for-profit health care system that owns and operates Rockford Memorial Hospital ("RMH"), also located in Rockford, Illinois.  Id. ¶ 20.  Defendants first began discussing a possible affiliation of the two Rockford hospitals in the spring of 2009, and by May 2010, they had executed a letter of intent.  Tr. at 592-93.   After performing "intensive due diligence," defendants entered into an affiliation agreement on January 31, 2011.   Tr. at 593; PX0037.  Under the terms of the affiliation agreement, OSF will acquire all of the operating assets of RHS and will become the sole corporate member of RHS.  PX0037 § 2.1.  OSF will then combine the hospital and physician operations associated with SAMC and RMH to create a new health care system with the name OSF Northern Region.  Id. § 2.4.

On November 17, 2011, after having investigated the proposed merger in this case, the FTC found reason to believe that the acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and initiated an administrative proceeding to determine the legality of the acquisition.  See Doc. 1 ¶ 26.  On November 18, 2011, the FTC filed its complaint and motion for preliminary injunction with this court.[2]  Docs. 1, 5.

On February 1-3, 2012, following expedited discovery, the court held an evidentiary hearing on the FTC's motion, in which each side was permitted to present four witnesses during an equal allotment of time.  The FTC presented two witnesses from managed care organizations ("MCOs"), Michelle Lobe, a regional vice president for network management with UnitedHealthcare, and Todd Petersen, CEO for Coventry Healthcare of Illinois, as well as two expert witnesses, Dr. Patrick Romano, M.D., M.P.H., a Professor of Medicine and Pediatrics at the University of California Davis

---

[2]Plaintiff also filed a motion for temporary restraining order, Doc. 6, but later withdrew the motion based on defendants' agreement to delay closing their affiliation agreement pending this court's ruling on the motion for preliminary injunction, Doc. 28.

School of Medicine, and Dr. Cory Capps, Ph.D., an economist with Bates White Economic Consulting. Defendants presented their own executives, David Schertz, President and CEO of OSF Healthcare System at SAMC, and Gary Kaatz, President and CEO of RHS; a local employer, Dean Olson of Rockford Acromatic Products Company; and an expert witness, Dr. Susan Manning, Ph.D., an economic consultant with Compass Lexecon. At the conclusion of the hearing, the parties moved for the admission of over 2,000 exhibits,[3] and neither side indicated any objection. See Tr. at 948-49. At the time, the court did not admit the exhibits, but rather directed the parties to specify in their post-hearing submissions the exhibits upon which they were relying. Tr. at 949.

In addition to the transcript of the evidentiary hearing and the exhibits identified by the parties as relevant to this proceeding, the court has reviewed and considered the complaint, Doc. 1; the motion for preliminary injunction and supporting memorandum, Doc. 5, and defendants' response thereto, Doc. 50; the parties' pre-hearing memoranda, Docs. 150, 155; defendants' post-hearing brief, Doc. 176, and proposed findings of fact and conclusions of law, Doc. 177; the plaintiff's post-hearing brief, Doc. 182, proposed findings of fact, Doc. 183, and proposed conclusions of law, Doc. 184; and the parties' reply briefs, Docs. 188, 191.[4] Based on this review, the court makes the following findings of fact and conclusions of law.

---

[3]Many of the parties' exhibits were subject to a protective order because they contain confidential information, and the parties and several intervenors have asked the court for these documents to remain under seal. The court's ruling on these motions is set forth in a separate order. For purposes of this order, however, the court notes that it has carefully reviewed any references made to the record in this opinion to ensure that no confidential material has been disclosed.

[4]The court also reviewed the parties' revised pleadings with corrected transcript citations where necessary.

## II. ANALYSIS

Section 7 of the Clayton Act prohibits acquisitions, including mergers, "where in any line of commerce or in any activity affecting commerce . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Section 7 is "designed to arrest in its incipiency . . . the substantial lessening of competition from the acquisition by one corporation" of the assets of a competing corporation. United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 589 (1957). Accordingly, "Congress used the words 'may be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." Brown Shoe Co. v. United States, 370 U.S. 294, 323 (1962); see also FTC v. Elders Grain, Inc., 868 F.2d 901, 906 (7th Cir. 1989) ("Section 7 forbids mergers and other acquisitions the effect of which 'may' be to lessen competition substantially. A certainty, even a high probability, need not be shown."). Although "ephemeral possibilities" of anticompetitive effects are not sufficient to establish a violation of Section 7, United States v. Marine Bancorp., Inc., 418 U.S. 602, 623 (1974) (quotation marks omitted), the statute nevertheless requires "a prediction, and doubts are to be resolved against the transaction," Elders Grain, 868 F.2d at 906.

Whenever the FTC has reason to believe that "any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission," including Section 7 of the Clayton Act, it is authorized by § 13(b) of the FTC Act to "bring suit in a district court of the United States to enjoin any such act or practice." 15 U.S.C. § 53(b). The district court may grant the request for a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." Id. Therefore, "in determining whether to grant a preliminary

injunction under section 13(b), a district court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities." FTC v. Univ. Health, Inc., 938 F.2d 1206, 1217 (11th Cir. 1991).

It is important to bear in mind that, when ruling on a request for a preliminary injunction pursuant to § 13(b), "[t]he district court is not authorized to determine whether the antitrust laws have been or are about to be violated. That adjudicatory function is vested in FTC in the first instance." FTC v. Food Town Stores, Inc., 539 F.2d 1339, 1342 (4th Cir. 1976); see also FTC v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1035 (D.C. Cir. 2008) (explaining that, in a § 13(b) preliminary injunction proceeding, "a district court must not require the FTC to prove the merits" of its underlying antitrust claim); Univ. Health, 938 F.2d at 1218 ("[O]ur present task is not to make a final determination on whether the proposed acquisition violates section 7 . . . ." (alterations and quotation marks omitted)). Rather, "[t]he only purpose of a proceeding under [§ 13(b)] is to preserve the status quo until FTC can perform its function." Food Town, 539 F.2d at 1342.

## A. Likelihood of Success

"To show a likelihood of ultimate success, the FTC must raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."[5] Univ. Health, 938 F.2d at 1218 (alteration and quotation marks omitted). "[T]he

---

[5]Although the FTC must raise questions that are "serious, substantial, difficult and doubtful," Univ. Health, 938 F.2d at 1218 (emphasis added) (quotation marks omitted), the court does not construe this as a mandate that all of these descriptors must be operative for each question the FTC must address. Rather, under the court's interpretation of the standard, the FTC satisfies its burden as to any particular question if it shows that the question has any one or more of these attributes. See FTC v. H.J. Heinz Co., 246 F.3d 708, 727 (D.C. Cir. 2001) (concluding that a preliminary injunction was warranted where "the FTC has raised serious and substantial questions"); FTC v.

district court must evaluate the FTC's chance of success on the basis of all the evidence before it, from the defendants as well as from the FTC." Whole Foods, 548 F.3d at 1035. Although the district court may not "simply rubber-stamp an injunction whenever the FTC provides some threshold evidence," the FTC "does not need detailed evidence of anticompetitive effect at this preliminary phase." Id. Instead, "at this preliminary phase it just has to raise substantial doubts about a transaction." Id. at 1036; see also Univ. Health, 938 F.2d at 1218 ("[T]he government must show a reasonable probability that the proposed transaction would substantially lessen competition in the future."); FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 116 (D.D.C. 2004) ("[T]he FTC need only show that there is a reasonable probability that the Acquisition may substantially lessen competition." (quotation marks omitted)); but cf. FTC v. Tenet Health Care Corp., 186 F.3d 1045, 1051 (8th Cir. 1999) ("A showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief.").

After first determining the relevant market, which "consists of two components: a product market and a geographic market," Tenet Health, 186 F.3d at 1051, courts often employ a burden-shifting approach to help determine if the FTC has shown a likelihood of success on the merits of its Section 7 claim, see, e.g., FTC v. H.J. Heinz Co., 246 F.3d 708, 715 (D.C. Cir. 2001). Initially, the FTC must make a prima facie showing that the proposed merger would result in "a firm controlling an undue percentage share of the relevant market" as well as "a significant increase in the concentration of firms in that market." United States v. Phila. Nat'l Bank, 374 U.S. 321, 363 (1963). The Supreme Court has explained that a merger with these characteristics "is so inherently

_____

Warner Commc'ns Inc., 742 F.2d 1156, 1164 (9th Cir. 1984) ("The government has met its burden of demonstrating a likelihood of success by presenting evidence sufficient to raise 'serious, substantial, difficult' questions regarding the anticompetitive effects of the proposed joint venture.").

6

likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." Id. Therefore, "[i]f the government makes this [prima facie] showing, a presumption of illegality arises." Univ. Health, 938 F.2d at 1218.

Once the FTC makes its prima facie showing, in order to rebut the presumption of illegality that arises, "the defendants must produce evidence that shows that the market-share statistics give an inaccurate account of the merger's probable effects on competition in the relevant market." Heinz, 246 F.3d at 715 (alteration and quotation marks omitted). To meet this burden, "the defendants may rely on nonstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences." Id. at 715 n.7 (alteration and quotation marks omitted). Additionally, "the defendants may demonstrate unique economic circumstances that undermine the predictive value of the government's statistics," id. (quotation marks omitted), or present "evidence showing that the intended merger would create significant efficiencies in the relevant market," Univ. Health, 938 F.2d at 1222. "If the defendant successfully rebuts the presumption of illegality, the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." Heinz, 246 F.3d at 715 (alteration and quotation marks omitted).

### 1. Relevant Markets

As noted above, the first step in the court's analysis is to determine the relevant product and geographic markets that are applicable in this case. "It is . . . essential that the FTC identify a credible relevant market before a preliminary injunction may properly issue" because a merger's effect on competition cannot be properly evaluated without a well-defined relevant market. Tenet

Health, 186 F.3d at 1051. In fact, "[a] monopolization claim often succeeds or fails strictly on the definition of the product or geographic market." Id. at 1052. In this case, however, defendants do not meaningfully dispute the relevant market definitions proposed by the FTC. See, e.g., Doc. 150 at 2 ("The structure of the healthcare market in Rockford is not in dispute.").

### a. Product market

A relevant product market is one in which a hypothetical monopolist could increase prices profitably by a "small but significant" amount for a meaningful period of time. U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (2010) § 4.1.1 ("Merger Guidelines"). A relevant product market defines the product boundaries within which competition meaningfully exists. United States v. Cont'l Can Co., 378 U.S. 441, 449 (1964). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).

### i. GAC market

The primary product market advanced by the FTC in this case is general acute care inpatient services ("GAC") sold to commercial health plans. See PX2501 § V.A.2; Tr. at 344-46; see also PX2263 ¶¶ 22-23. This is a "cluster market" of services that courts have consistently found in hospital merger cases, even though the different types of inpatient services are not strict substitutes for one another. See FTC v. ProMedica Health Sys., Inc., No. 3:11 CV 47, 2011 WL 1219281, at *54 (N.D. Ohio Mar. 29, 2011) (collecting cases); see also United States v. Rockford Mem'l Corp., 898 F.2d 1278, 1284 (7th Cir. 1990) (upholding a similar GAC product market). In this case, the FTC defines the GAC market to "encompass a broad cluster of medical and surgical diagnostic and

treatment services that include an overnight hospital stay, including, but not limited to, many emergency services, internal medicine services, and surgical procedures." Doc. 1 ¶ 33. The GAC market does not include outpatient services, rehabilitation services, psychiatric services, or complex tertiary and quarternary services, as these services are offered by a different set of competitors. Id. ¶ 34; Tr. at 8, 346-47. In their post-hearing submissions, defendants do not dispute that GAC services, as defined by the FTC, is a relevant product market.[6]

### ii. PCP market

The FTC has also alleged that primary care physician services ("PCP") is another relevant product market in which the proposed merger is likely to have anticompetitive effects. Without expressing any opinion on the ultimate merits of this claim, the court observes that the FTC's likelihood of success on its claim involving the PCP market is distinctly lower than its claim involving the GAC market for a number of reasons. For example, the post-merger market concentration level in the PCP market is not as high as the concentration level would be in the GAC market. Compare PX2501 App. H (PCP market) with PX2501 § V.B.1 (GAC market). According to the Merger Guidelines, the proposed merger would only yield a moderately concentrated market for PCP services that would "potentially raise significant competitive concerns," whereas in the GAC market the merger would result in a highly concentrated market and a presumption that the merger would "likely . . . enhance market power." Merger Guidelines § 5.3. In addition, the PCP market is not subject to the same prohibitive barriers to entry that exist in the GAC market, and the bargaining leverage held by large insurance companies with respect to physician contracting is

---

[6]Defendants do submit in their proposed findings of fact that there is not a single, universally accepted definition of "general acute care inpatient services" among MCOs, see Doc. 177 ¶¶ 726-29, but this does not affect the court's analysis.

different than what would exist in contracting for GAC services if the merger were to take place. All of these distinguishing features make it less likely that the FTC will prevail on its claim involving the PCP market compared to its chance of success on its claim involving the GAC market.

Based on the foregoing considerations and the fact that the FTC is not required "to settle on a market definition at this preliminary stage," Whole Foods, 548 F.3d at 1036, the court asked the parties to address in their post-hearing submissions what consequences would occur if the court were to find that the FTC met its burden only with respect to one of the proposed markets. In their briefing, the parties agree that a finding that the FTC met its burden with respect to the GAC market only would result in issuance of a preliminary injunction and, at least as a practical matter, would preclude defendants from consummating the transaction and implementing the affiliation in all respects, including the merger of physician services. Given these circumstances, the court finds it unnecessary to analyze the PCP market at this time, and instead will focus its analysis solely on the merger's potential impact in the GAC market.

### b. Geographic market

"A geographic market is the area in which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." Tenet Health, 186 F.3d at 1052. "Defining the geographic market is a pragmatic undertaking," ProMedica, 2011 WL 1219281, at *55 (quotation marks omitted), and the relevant geographic market should "correspond to the commercial realities of the industry," Brown Shoe, 370 U.S. at 336.

According to plaintiff's expert, Dr. Capps, "[t]he relevant geographic market applicable to the proposed merger is the area contained within a roughly 30-minute drive of downtown

Rockford."[7] PX2501 ¶ 149. This geographic area includes all three hospitals in Rockford, but it excludes smaller hospitals from the outlying areas. Id. This definition is consistent with defendants' expert, Dr. Monica G. Noether, Ph.D., who stated generally that the "geographic area spans at least Winnebago and Boone Counties as well as parts of Ogle County." DX0005 ¶ 12.[8] The court notes that this geographic area is somewhat smaller than the "Winnebago–Ogle–Boone area" that was adopted by this court in a prior case. See United States v. Rockford Mem'l Corp., 717 F. Supp. 1251, 1277 (N.D. Ill. 1989); see also PX2501 § V.A.3, Figure 19. However, both experts agree that slight changes to the precise contours of the geographic area (i.e. including or excluding certain zip codes from the geographic market) would not have any significant effect on market share and concentration calculations. See PX2501 ¶ 148; DX0364 ¶ 101. Likewise, defense counsel indicated at the hearing that defendants are not contesting the relevant geographic market in this case. See Tr. at 54. Therefore, the court finds that the area encompassing a 30-minute drive-time radius from Rockford is an appropriate geographic market to use in this case.

### 2. Prima Facie Case

To establish a prima facie case, the FTC must show that the proposed merger would result in the merged entity controlling a large percentage share of the relevant GAC market and that the merger also would yield a significant increase in market concentration. See Phila. Nat'l Bank, 374 U.S. at 363. If this showing is made, then the proposed merger is presumed to be unlawful. See

---

[7]As shown in Figure 19 of Dr. Capps' expert report, this area includes approximately the lower three-quarters of Winnebago County, the southwest portion of Boone County including Belvidere, and the northeast corner of Ogle County. See PX2501 § V.A.3, Figure 19.

[8]Although the parties were unable to have all of their experts testify at the hearing, the court has still considered the written reports of the non-testifying expert witnesses and relied on those reports when appropriate.

Univ. Health, 938 F.2d at 1218; see also ProMedica, 2011 WL 1219281, at *56 ("A duopoly . . . is presumptively unlawful in and of itself.").

According to plaintiff's expert, Dr. Capps, the proposed merger in this case would result in the merged entity controlling a substantial share of the GAC market and would yield a significant increase in market concentration. Defendants do not specifically challenge these calculations. Rather, defendants argue that the court must consider more than just market share statistics in order to determine whether the affiliation would be anticompetitive. The court recognizes that the Supreme Court has "cautioned that statistics concerning market share and concentration, while of great significance, [are] not conclusive indicators of anticompetitive effects," United States v. Gen. Dynamics Corp., 415 U.S. 486, 498 (1974), and the court will address all of defendants' rebuttal arguments in detail in § II.A.3 below. However, the first step in the court's analysis is to determine if the FTC has made its prima facie showing.

### a. Percentage of market

In Philadelphia National Bank, the Supreme Court concluded that a merger resulting in a single firm controlling at least 30% of the relevant market was sufficient to "raise an inference that the effect of the contemplated merger . . . may be substantially to lessen competition." 374 U.S. at 364-65. The Court further explained that, "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." Id. at 364; see also FTC v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 52 (D.D.C. 1998) ("[A] prima facie case can be made if the government establishes that the merged entities will have a significant percentage of the relevant market–enabling them to raise prices above competitive levels.").

12

In this case, Dr. Capps measured the market shares of the participants in the GAC market on two bases: patient admissions and patient days. PX2501 ¶ 162. Both measures "provide information relevant to predicting the likely competitive effects of the merger." Id. "Patient admissions are informative because they indicate the degree of consumer preference for a particular hospital," and as a result, "higher shares give a hospital or hospital system more leverage in negotiations with health plans." Id. "Computing market shares on the basis of patient days is also informative because doing so gives greater weight to more complicated and intensive services that require a longer length of stay." Id. ¶ 163.

Dr. Capps calculated the post-merger market shares under both measures and found that the merged entity would control 59.4% of the GAC market based on patient admissions or 64.2% of the market based on patient days.[9] Id. ¶ 164, Figure 20. These market shares far surpass the threshold found to be presumptively unlawful in Philadelphia National Bank, and they also exceed the percentages found in other hospital merger cases in which the FTC has established a prima facie case. See Univ. Health, 938 F.2d at 1219 (concluding that the FTC "clearly established a prima facie case of anticompetitive effect" where the merged entity would control approximately 43% of the GAC market with three remaining competitors); ProMedica, 2011 WL 1219281, at *12 (finding, "[b]y a wide margin," that the proposed acquisition was "presumptively anticompetitive" where the merged entity would control 58.3% of the GAC market with two remaining competitors). Based on these market share calculations, the court has no trouble finding that the combined entity in this case

---

[9]Dr. Capps calculated the post-merger market share of SwedishAmerican Hospital, the only other hospital in the relevant market, as 40.6% based on patient admissions or 35.8% based on patient days. PX2501 § V.B.1, Figure 20.

would control "an undue percentage share of the relevant market." Phila. Nat'l Bank, 374 U.S. at 363.[10]

### b. Increase in market concentration

The FTC has also shown that the proposed merger would result in "a significant increase in the concentration of firms" in the GAC market. Phila. Nat'l Bank, 374 U.S. at 363. "The most prominent method of measuring market concentration is the Herfindahl-Hirschmann Index (HHI)." Univ. Health, 938 F.2d at 1211 n.12; see also ProMedica, 2011 WL 1219281, at *56 ("Courts have . . . adopted and relied on the HHI as a measure of market concentration."); Merger Guidelines § 5.3 ("The Agencies often calculate the Herfindahl-Hirschman Index ('HHI') of market concentration."). "The HHI is calculated by summing the squares of the individual firms' market shares, and thus gives proportionately greater weight to the larger market shares." Merger Guidelines § 5.3. High levels of concentration raise anticompetitive concerns, and the HHI calculation provides one way to identify mergers that are likely to invoke these concerns. Id.; see also Univ. Health, 938 F.2d at 1218 n.24 ("Significant market concentration makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level." (quotation marks omitted)); FTC v. PPG Indus., Inc., 798 F.2d 1500, 1503 (D.C. Cir. 1986) (explaining that "increased concentration raises a likelihood of interdependent anticompetitive conduct . . . [based] upon the theory that, where rivals are few, firms will be able

---

[10]Although it does not change the court's finding, it should be noted that the projected market shares in this case are somewhat lower than the percentages found by this court in its order enjoining the proposed merger between Rockford Memorial and SwedishAmerican in 1989. See Rockford Mem'l Corp., 717 F. Supp. at 1280 (finding that the merged entity would control 68.2% of the GAC market based on patient admissions or 72.4% based on patient days).

to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict

output and achieve profits above competitive levels") (citations and quotation marks omitted)).

According to the Merger Guidelines, an HHI above 2,500 signifies a highly concentrated

market. Merger Guidelines § 5.3. "Mergers resulting in highly concentrated markets that involve

an increase in the HHI of more than 200 points will be presumed to be likely to enhance market

power." Id.; see also Heinz, 246 F.3d at 716 ("Sufficiently large HHI figures establish the FTC's

prima facie case that a merger is anti-competitive."). In this case, the GAC market in the Rockford

area is already highly concentrated, and the proposed merger would substantially increase the level

of concentration. See PX2501 § V.B.1, Figure 20. Specifically, if the market shares are measured

on the basis of patient admissions, plaintiff's expert calculates that the HHI changes from 3,411

points pre-merger to 5,179 points post-merger, for an increase of 1,767 points.[11] Id. This increase

in the HHI calculation is nearly nine times as great as the 200 point increase required to raise the

presumption of enhanced market power under the Merger Guidelines. Likewise, if the market shares

are measured on the basis of patient days, plaintiff's expert calculates that the HHI changes from

---

[11]The court notes some minor discrepancies with the expert's calculations of the HHI based
on patient admissions, but finds that these errors do not have any impact on the court's analysis.
First, there appears to be an error in one of the pre-merger share calculations for either SAMC
(29.8%) or RMH (29.7%), as these two figures total 59.5% (not the 59.4% reflected in the post-
merger calculations) and result in a total pre-merger market of 100.1% after adding
SwedishAmerican's share of 40.6%. Second, the HHI calculations are slightly off. Using the
numbers listed in Figure 20, the court calculates a pre-merger HHI of 3,418 (after rounding down).
If the pre-merger share of either SAMC or RMH was adjusted downward by 0.1% to correct the
error identified above, the HHI would be 3,413 (after rounding up) under either calculation.
Additionally, the post-merger HHI should be 5,177 (after rounding up) based on shares of 40.6%
for SwedishAmerican and 59.4% for the merged entity. Based on the court's calculations, it appears
that the HHI increase is somewhere between 1,758 and 1,764, or within 10 points of the expert's
calculated amount. This minor discrepancy does not have any significant impact on the court's
analysis.

15

3,353 to 5,406 points, for an increase of 2,052 points.[12] Id. This HHI increase is more than ten times

the amount needed for the presumption to arise. Under either method of calculating market shares,

the court finds that the FTC has demonstrated "a significant increase in the concentration of firms"

in the relevant market. Phila. Nat'l Bank, 374 U.S. at 363.

The increase to the HHI in this case of between 1,767 to 2,052 points is much higher than

many other cases in which the government has demonstrated a prima facie case. See, e.g., Heinz,

246 F.3d at 716 (HHI increased by 510 points); Univ. Health, 938 F.2d at 1211 n.12 (HHI increased

by 630 points); PPG Indus., 798 F.2d at 1502-03 (HHI increased by 1,352 points); United States v.

H & R Block, Inc., __ F. Supp. 2d __, 2011 WL 5438955, at *29 (D.D.C. Nov. 10, 2011) (HHI

increased by approximately 400 points); FTC v. CCC Holdings Inc., 605 F. Supp. 2d 26, 45-46

(D.D.C. 2009) (HHI increased by 2,035 points in one market and 545 points in a second market);

Cardinal Health, 12 F. Supp. 2d at 53-54 (HHI increased by between 629 to 1,733 points depending

on market definitions); ProMedica, 2011 WL 1219281, at *12 (HHI increased by 1,078 points in the

GAC market and 1,323 points in a second market). This large HHI increase "creates, by a wide

margin, a presumption that the merger will lessen competition in the [relevant] market." Heinz, 246

F.3d at 716.

### c. Cases denying an injunction are distinguishable

Rather than contesting the FTC's market share and market concentration evidence, which

overwhelmingly satisfies the FTC's burden to establish a prima facie case, defendants claim that

---

[12]Once again, the court notes a few minor errors in these calculations. First, using the expert's HHI calculations in Figure 20, the HHI increase should be 2,053, not 2,052. Second, the post-merger HHI should be 5,403 (after rounding down), not 5,406. Therefore, based on the court's calculations, it appears that the HHI increase is actually 2,050. These minor changes in the calculations do not alter the court's analysis.

"[c]ourts have frequently denied the government an injunction in hospital mergers resulting in high post-transaction HHI levels and even, as here, a 'three-to-two' combination." Doc. 176 at 5. However, the cases cited by defendants in support of this claim are distinguishable from the facts of this case and do not demonstrate that the FTC's request for an injunction should be denied.

Defendants first cite FTC v. Freeman Hospital, 69 F.3d 260, 262 (8th Cir. 1995), along with an explanatory parenthetical stating: "denied preliminary injunction in a three-to-two merger." Doc. 176 at 5. A review of that case, however, reveals that the Court of Appeals upheld the denial of a preliminary injunction because "the FTC failed to produce sufficient evidence on the crucial aspect of the geographic market." Freeman Hosp., 69 F.3d at 269. As the Court explained in its opinion, it is "essential that the FTC identify a credible relevant market before a preliminary injunction may issue," because "[w]ithout a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning." Id. at 268 & n.12. Because the geographic market in this case has been adequately identified by the FTC with no challenge from defendants, Freeman Hospital is readily distinguishable and provides no assistance to defendants.

Defendants also cite FTC v. Tenet Health Care Corp., 186 F.3d 1045, 1047 (8th Cir. 1999), a case in which the appellate court reversed the district court's decision to grant a preliminary injunction to the FTC in a case involving the merger of two hospitals in Poplar Bluff, Missouri, a city of 17,000 people. Defendants point out in their brief that "the resulting market share was 84%, and the post-merger HHI would be 6,000 to 7,000." Doc. 176 at 5. What defendants fail to mention, however, is that the Court reversed only after "conclud[ing] that the FTC produced insufficient evidence of a well-defined relevant geographic market," and that "[t]he FTC's failure to prove its relevant geographic market [was] fatal to its motion for injunctive relief." Tenet Health, 186 F.3d

at 1053.  Likewise, the failure to establish the relevant market invalidates the market share statistics

advanced by the FTC in Tenet Health and cited by defendants in this case.  Because Tenet Health

was decided based on the failure to establish the geographic market, which is not at issue in this

case, defendants' reliance on that case is misplaced.

The court finds United States v. Long Island Jewish Medical Center, 983 F. Supp. 121

(E.D.N.Y. 1997), to be distinguishable for similar reasons.  Defendants rely on this case as an

example of a court denying a preliminary injunction "where the merging hospitals had 100% of the

market alleged by the government."  Doc. 176 at 5.  However, the court rejected the government's

product market definition in that case, finding that it was "unduly restricted to 'anchor' hospitals"

and improperly excluded several area hospitals which provided general acute care inpatient services.

Long Island, 983 F. Supp. at 138.  In this case, on the other hand, there is no dispute that the GAC

market is a properly defined product market, and as such, the market share calculations advanced

by the FTC are not inflated in the same way that they were in the Long Island case.

The final case cited by defendants in support of their claim that courts frequently deny

injunctive relief, even when there are high post-transaction HHI levels, is FTC v. Butterworth Health

Corp., 946 F. Supp. 1285, 1294 (W.D. Mich. 1996).  In Butterworth, the court found that the FTC

had made its prima facie case, but nevertheless denied the request for a preliminary injunction.  Id.

at 1302-03.  In doing so, the court relied on at least two considerations of "critical importance" that

are not present in the instant case.  Id. at 1302.

First, the Butterworth court credited the defendants' argument, bolstered by expert testimony,

that "nonprofit hospitals operate differently in highly-concentrated markets than do

profit-maximizing firms."  Id.  But other courts, including the Seventh Circuit, which this court is

obligated to follow, have rejected this premise. See Rockford Mem'l, 898 F.2d at 1285 (rejecting the contention that nonprofit hospitals would not seek to maximize profits by exercising their market power); Univ. Health, 938 F.2d at 1213-14 ("[T]he district court's assumption that University Hospital, as a nonprofit entity, would not act anticompetitively was improper."); ProMedica, 2011 WL 1219281, at *22 (finding that the defendant, a nonprofit entity, nevertheless "exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans"). Likewise, the evidence in this case reflects that nonprofit hospitals do seek to maximize the reimbursement rates they receive. See, e.g., Tr. at 255 (executive with insurance company familiar with negotiating managed care contracts stating that it has "[a]bsolutely" been his experience that "nonprofit hospitals negotiate rates just as aggressively as for-profit hospitals"); Tr. at 428 (plaintiff's expert explaining that "nonprofits, just like for-profits, will seek to negotiate higher rates when they can," and that "the bulk of the literature clearly shows that where nonprofits have market power, they will exercise it"); see also PX2501 § IV.E (plaintiff's expert specifically rejecting the expert study relied on in Butterworth and opining that "hospital mergers that create market power do lead to higher prices, and that this is true for both for-profit and nonprofit hospitals"). Based on the above, the court disagrees with the finding made in Butterworth regarding the operation of nonprofit hospitals and finds this to be a significant distinguishing factor.

Second, the Butterworth court found significant and relied on a commitment by the merging hospitals to freeze prices at both hospitals for three years and to limit price increases for the following four years. 946 F. Supp. at 1298, 1302. Although defendants entered into evidence a last-minute proposed stipulation in this case, see DX0938, as discussed later in this opinion, this stipulation does not contain an agreement similar to the one in Butterworth to either freeze or limit

rate increases if the merger were completed, see id.; Tr. at 747, 760. Thus, unlike the defendants in Butterworth, there is no legal obligation for defendants in this case to maintain or limit price increases post-merger. As a result, this is another key distinguishing factor limiting the persuasiveness of the Butterworth decision.

### 3. Rebuttal Arguments

Based on the foregoing, the court finds that the FTC has demonstrated a very compelling prima facie case based on market concentration levels that are much higher than many other cases in which a preliminary injunction under § 13(b) has been entered. This of course does not end the analysis, but it does make it more difficult for defendants to overcome the strong presumption of illegality that has arisen in this case. See Heinz, 246 F.3d at 725 ("[T]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." (quotation marks omitted)); see also H & R Block, 2011 WL 5438955, at *29 (adopting the Heinz sliding scale standard for rebutting a prima facie case).

Before turning to defendants' rebuttal arguments, its important to once again remember that "the issue in this action for preliminary relief is a narrow one," and the court does "not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." FTC v. Warner Commc'ns Inc., 742 F.2d 1156, 1164 (9th Cir. 1984). Instead, "[a]ll that is necessary is that the merger create an appreciable danger of [anticompetitive] consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable is called for." Hosp. Corp., 807 F.2d at 1389 (citation omitted); see also Phila. Nat'l Bank, 374 U.S. at 371 (noting that where a merger

20

substantially lessens competition, it "is not saved because, on some ultimate reckoning of social or economic debits or credits, it may be deemed beneficial").

### a. Supracompetitive price increases

Defendants first argue that, despite the high concentration levels, the proposed merger will not allow them to raise prices to supracompetitive levels for several reasons. Specifically, defendants contend that SwedishAmerican has the ability to remain a robust competitor, that large MCOs can defeat any attempt by OSF Northern Region to raise prices by offering a lower priced single-hospital network, and that defendants' proposed stipulation eliminates any concerns of anticompetitive behavior. Defendants also assert that plaintiff's expert has not performed a merger simulation to determine the actual price effect of the proposed merger. As discussed below, these arguments, whether considered individually or cumulatively, are insufficient to overcome the FTC's strong prima facie case.

### i. Competition from SwedishAmerican

As one of the three hospitals in the Rockford area, SwedishAmerican is a strong competitor of defendants and has continued to expand its offerings in order to attract more patients. As defendants' expert, Dr. Manning, details, SwedishAmerican is the current market leader based on a number of different metrics, including patient discharges, staffed beds, and net patient revenue. DX0005 ¶ 47. In the past five years, SwedishAmerican has grown its share in nearly all inpatient service lines, and is now the top provider in more than half of the service lines, including the five highest-volume service lines. Id. ¶ 48. SwedishAmerican has also continued to expand its footprint by opening a new $50 million Heart Hospital in 2006, purchasing a small hospital in nearby

Belvidere, Illinois, in 2009, and signing an affiliation agreement with the University of Wisconsin-Madison in 2010. Id. ¶¶ 51, 54-55.

However, the continued existence of one competitor following the merger, even a strong competitor, does not necessarily reduce the probability that the proposed merger would substantially lessen competition in the future. See PX2506 § VIII.A. In fact, regardless of the post-merger environment, "[t]he elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition." Merger Guidelines § 6. Here, rather than continuing to compete against SwedishAmerican, defendants have chosen to pursue an affiliation that would automatically boost the combined entity's market share to the top position and simultaneously lessen the number of competitors from three to two. Although it is true that SwedishAmerican will remain as a competitor, the court is not aware of, and defendants have failed to cite, any authority which holds that the FTC is required to show that all competition will be eliminated as the result of a merger in order to obtain an injunction pending the administrative trial on the merits. Accordingly, the court does not find that this argument rebuts the FTC's case.

### ii. MCO contracting

Defendants next argue that large, sophisticated insurance companies will be able to defeat any threatened post-merger price increases by refusing to contract with OSF Northern Region and instead marketing a health insurance product with SwedishAmerican as the only in-network hospital. Based on the court's review of the evidence, however, it appears that this prediction of the future bargaining dynamics between hospitals and MCOs ignores the current realities of the health insurance market in the Rockford area, does not accurately take into account the lack of success seen

with single-hospital networks in the past, and does not demonstrate that MCOs will be able to effectively constrain the merged entity's market power.

As a general rule, the merger of two closely substitutable hospitals will increase the combined system's bargaining leverage because "the alternative . . . of not contracting becomes less attractive from the perspective of health plans." PX2501 ¶ 192; see also PX0252 ¶ 16 ("A hospital's bargaining leverage is higher where few alternative hospitals exist, or the alternatives that do exist are insufficient for [the MCOs] to build an attractive network."). This is especially true in the Rockford market, where there have historically been three competing hospitals. Because "consumers place a high value on having a choice of in-network providers," a health plan is more attractive to customers when it includes at least two of the three Rockford hospitals in its provider network. Id. ¶ 193; see also id. ¶ 194 & n.271 ("Area health plans and employers have consistently stated that their members strongly prefer networks that offer a choice of hospital providers."); Tr. at 30 ("Members choose their health coverage because of access and cost, and generally one hospital does not satisfy enough of the membership to provide that access need for an employer group."); PX4764 ("[S]pending 5 years [trying to sell a one-hospital network] has taught us a truth all others seem to know – you need two of the three hospitals to achieve any real measure of success in Rockford."); PX0213 at 95 ("[T]o be marketable you have to have two hospitals in Rockford."). "Indeed, all of the major health plans serving the Rockford area offer products that give their members a choice of two hospitals in Rockford." PX2501 ¶ 193; id. § V.C.3, Figure 23.

Given the current norms and expectations of Rockford area consumers, the proposed merger in this case would give the combined entity significant bargaining leverage, which would in turn

allow the combined entity to extract higher prices from MCOs.[13]  This is because the proposed

merger does not eliminate any of the hospitals, at least not immediately.  See Tr. at 615.  From the

consumer's perspective, there would still be the same three hospitals in Rockford,[14] and there is no

reason to think that these consumers would no longer value having a choice of hospitals.  However,

there would only be three possible network configurations after the merger: (1) a network with all

three hospitals; (2) a network with only the OSF Northern Region hospitals (RMH and SAMC); or

(3) a network with only SwedishAmerican.  Thus, in order to provide an attractive health insurance

plan that provides the same level of access that is currently offered, an MCO would be required to

choose either option 1 or option 2, both of which would require the MCO to contract with OSF

Northern Region.  "The unilateral ability to force health plans into this unattractive position will

increase the merged entity's bargaining power."  PX2501 ¶ 194.

Defendants' answer to this problem is to argue that it would be possible for the MCOs to

choose option 3 and effectively market a health plan with SwedishAmerican as the only in-network

hospital.  In support of this argument, however, defendants overstate the successfulness of current

---

[13]Plaintiff's expert summarized the potential harm that could come from post-merger price
increases:

> First, consumers enrolled in plans that continue to contract with SAMC-RMH would
> pay more for access to the same set [of] hospitals.  Second, individuals and group
> enrollees who lose coverage as a result of price increases would be harmed by the
> loss of health insurance coverage.  Third, customers who avoid the direct effect of
> the price increase by switching to a product featuring a SwedishAmerican-only
> network would not necessarily pay more, but would receive less choice, which
> consumers value, in exchange for their premiums.

PX2501 ¶ 194 n.263.

[14]Because there would still be three hospitals in Rockford after the proposed merger, the
court finds that comparisons to communities that currently only have two hospitals is not helpful in
trying to predict the impact on bargaining between hospitals and MCOs in this case.

24

attempts to market a one-hospital network in Rockford.  For example, defendants cite to United's "Core" product, which is a lower-cost health insurance product with SwedishAmerican as the only in-network provider, Tr. at 75, and they argue that it has exceeded expectations in membership volume and is considered a success.  What defendants fail to mention, however, is that although membership did grow in Chicago, "the membership in Rockford remained the same," Tr. at 76, and United has had a difficult time determining how successful the product has been in the Rockford area, Tr. at 38-39.  Similarly, defendants cite to the membership numbers from an HMO network offered by Blue Cross Blue Shield that includes SwedishAmerican as the only Rockford area provider, but fail to note that its PPO product, which includes two area hospitals, is "much more popular" than the HMO product despite its higher cost, see DX0699 at 141-43, or that the enrollment in the HMO plan has been declining over time, see PX2501 ¶ 58 n.76.  Defendants also tout SAMC's one-hospital Direct Access Network as an exemplar, but the record reveals that, even though the plan has been available since 2008, only one employer has signed up for the plan, and that did not occur until November 2011.  Tr. at 617-19.

The struggles that these current single-hospital networks face is not unusual, but rather is consistent with the history of failure associated with other similar products that have been attempted in Rockford in the past.  See, e.g., Tr. at 240 (noting that Coventry was "not able to successfully market a single network provider"); PX0251 ¶ 15 ("It was extremely difficult for Aetna to compete with other health plans in the Rockford area when offering a single-hospital network and our membership was flat for that period."); PX2501 ¶ 194 (detailing the history of single-hospital health plans sold by each of the three hospitals and the subsequent transition to two-hospital networks); see

also Tr. at 372 (noting that health plans "clearly emphasize that members value access and choice" such that a one-hospital network "is less valuable than one that includes more choice").

Based on the substantial bargaining leverage that will be held by OSF Northern Region if the merger was consummated and the present and historical difficulties associated with marketing a single-hospital network in Rockford, the court is not convinced that MCOs will be an effective constraint on the ability of the merged entity to use its market power to raise prices. Accordingly, the court finds defendants' argument in this regard to be insufficient to counteract the FTC's prima facie case.

### iii. Proposed stipulation

In advance of the hearing in this case, defendants filed a proposed stipulation, which they now claim "eviscerates" the FTC's concerns about anticompetitive conduct. Doc. 176 at 13-14. The FTC does not share this view, and instead claims that the "proposed stipulation amounts to a thinly veiled attempt to mask the competitive harm from the Acquisition." Doc. 182 at 18. The court has reviewed the proposed stipulation but finds that it does not rebut the FTC's prima facie case.

The proposed stipulation provides that, upon consummation of the merger, OSF Northern Region will not require any MCO to (1) "exclude SwedishAmerican Health System from its provider network as a condition for a contract with OSF Northern Region," or (2) "contract with OSF on a system-wide basis or any other individual OSF hospital outside of the OSF Northern Region as a condition for obtaining a contract with the OSF Northern Region hospitals." DX0938.

In the court's view, the proposed stipulation does address some limited concerns, but it does not specifically preclude price increases or otherwise limit the ability of OSF Northern Region to exercise its market power in order to achieve higher prices. See id.; see also Tr. at 431 (plaintiff's

expert stating that the proposed stipulation "really does nothing to address the competitive harms from this merger" because "it says nothing about the prices or the terms at which they would contract"). For example, the first stipulation does address a concern over whether the current contracting practice employed by SAMC of requiring semi-exclusivity (i.e. allowing an MCO to contract with only one other Rockford hospital) would remain post-merger. See PX2501 ¶ 155. While the stipulation does eliminate that concern, the only true effect of the stipulation is that it leaves open the possibility of option 1, discussed above in § II.A.3.a.ii, that insurance companies can offer a network with all three hospitals. However, this type of network configuration has at least two problems associated with it and, consequently, does not limit the ability of OSF Northern Region to seek higher prices during negotiations. Specifically, a network with all three hospitals reduces the MCOs' bargaining power because they can no longer provide the hospitals with any steering of patients. More importantly, as discussed above, because the option of not contracting with OSF Northern Region means an undesirable single-hospital network, the merged entity would be able to demand higher prices in its contracts. The combination of these two factors puts a thumb on the scale in favor of option 2, or contracting with only the OSF Northern Region. See Tr. at 313 (agreeing that the stipulation would not require exclusion of SwedishAmerican, but commenting that "with the combined market force, they will effectively be able to force us into that").

Likewise, the second proposed stipulation addresses a valid concern about whether MCOs would be required to contract with OSF on a system-wide basis in order to obtain a contract with OSF Northern Region, but it does nothing to limit the ability of OSF Northern Region, within the Rockford market, to raise prices. See Tr. at 432-33. Therefore, while the proposed stipulation does

provide some minimal constraints on the market power of the combined entity, it does not eliminate the concern about potential anticompetitive effects underlying the FTC's prima facie case.

### iv. Merger simulation

As a final argument on the issue of price increases, defendants briefly challenge the FTC's economic expert based on the fact that he never performed a merger simulation to determine the actual price effect of the proposed merger. See Tr. at 481-83. However, Dr. Capps has determined that there will be a substantial price increase if the merger were consummated, and he has attempted to corroborate this conclusion with his "willingness-to-pay" analysis. See PX2501 §§ V.C.3, V.C.4. At this stage of the proceedings, the court is only determining whether there are "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." Univ. Health, 938 F.2d at 1218. If anything, defendants' argument only reinforces the conclusion that there are serious and substantial questions requiring further determination by the FTC at the trial on the merits. Because defendants have cited no authority indicating that a merger simulation is required in order to obtain a preliminary injunction, the court rejects this argument and finds that, even when considered in conjunction with defendants' other arguments on prices, it does not overcome the FTC's compelling prima facie case.

### b. Coordinated effects

Defendants next argue that the FTC has no evidence that the merger will result in any unlawful coordination. "A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers." Merger Guidelines § 7; see also Hosp. Corp., 807 F.2d at 1387 ("The fewer competitors there are in a

market, the easier it is for them to coordinate their pricing . . . .").  Although "the risk that a merger will induce adverse coordinated effects may not be susceptible to quantification or detailed proof," such a risk can be evaluated by reviewing market concentration and any history of collusion in the relevant market.  Merger Guidelines § 7.1.  Here, the relevant market is highly concentrated and there is at least some history of coordinated efforts among the Rockford hospitals.

Generally, once "the government has established its prima facie case, the burden is on the defendants to produce evidence of 'structural market barriers to collusion' specific to this industry that would defeat the 'ordinary presumption of collusion' that attaches to a merger in a highly concentrated market."  H & R Block, 2011 WL 5438955, at *33 (quoting Heinz, 246 F.3d at 725).  In this case, however, the FTC has not relied solely on its prima facie case, but has also detailed several incidents which it claims demonstrate coordinated activity.  See Doc. 182 at 9.  While the court finds that some of the claimed coordination is fairly benign, such as hiring a consultant to help evaluate the healthcare market in the region, there is some evidence that suggests that there is a risk of coordinated activity by the hospitals in Rockford after the merger, especially once "communication becomes easier and more effective" with only two competitors.  Tr. at 403.

The first example showing at least some history of coordination involves efforts by one hospital to determine if it was in a bidding war against a competitor for a contract with a health insurance company.  The first hospital contacted the Managed Care Director for the competitor and was told that they were not in contract negotiations with the insurance company at that time.  See PX0630 at 4.  "[T]he ultimate effect [of this coordinated activity] was that they did not agree to give the larger discount to the health plan in question, but instead held out for a higher amount" of reimbursement from the health plan.  Tr. at 398.  Another example involves two of the hospitals

29

allegedly contacting a health plan and stating that, if the health plan wanted to contract with either one of them, it had to exclude the third hospital from its network. See PX4000 at 69-71; PX1265. This evidence of hospitals putting up a type of "united front in negotiations with the third-party payors" is an example of the dangers of collusion that the antitrust laws seek to prevent. Hosp. Corp., 807 F.2d at 1389.

Defendants try to rebut the FTC's charge that the proposed merger comes with an increased risk of unlawful coordination by arguing generally that the FTC's theory is implausible, that the facts it relies on are stale, and that the executives at all three hospitals have testified that they would not allow coordinated behavior to occur in the future. These arguments are insufficient to overcome the presumption of collusion that arises from the combination of the FTC's strong prima facie case, see H & R Block, 2011 WL 5438955, at *33, and the evidence of coordinated behavior discussed above. First, defendants' argument that it is implausible to suggest that the merger would allow OSF Northern Region to both exclude and collude with SwedishAmerican misconstrues the FTC's position. Although the court agrees that OSF Northern Region could not simultaneously both exclude and collude, plaintiff's expert explained that the combined entity could use the threat of exclusion to induce collusive behavior from SwedishAmerican. See Tr. at 404-06. Second, the court disagrees with defendants' characterizations of the FTC's evidence as stale, where the conduct the court finds most damaging occurred within the past seven years.[15] Finally, relying on the

---

[15]The court does agree that it would be "stale" to rely on the evidence of collusion among the Rockford hospitals that was found by this court in United States v. Rockford Memorial Corp., 717 F. Supp. at 1286. Thus, the court has not relied on this evidence of collusion from almost thirty years ago, but notes that most of the evidence presented by the FTC involves much more recent conduct.

testimony of hospital executives adds little to the analysis of this particular issue, as they would be expected to publically disavow any improper conduct and not condone such conduct in the future.

Based on the foregoing, the court agrees with the FTC that the proposed merger in this case does involve an increased risk of coordinated conduct in the relevant market, and that defendants have failed to successfully rebut this aspect of the FTC's case. To be clear, the court is not finding that the hospitals would necessarily collude after the merger, only that this merger adds to the risk of such behavior. Accordingly, the court finds that the FTC has raised serious and substantial questions on the issue of coordinated behavior that require further investigation and determination during the merits trial.

### c. Efficiencies and community benefits

Defendants also argue that the FTC cannot demonstrate a likelihood of success on the merits because the proposed merger would result in substantial efficiencies, both in terms of annual recurring savings and one-time capital avoidance savings, which would permit the parties to redeploy capital in order to improve and expand medical services and increase consumer welfare. Similarly, defendants argue that a consolidation will allow them to improve quality of care for their patients in a number of different ways. Overall, defendants claim that these benefits will outweigh any anticompetitive effects and rebut the presumption of illegality demonstrated by the FTC's prima facie case.[16]

---

[16]Although defendants' arguments on efficiency and improved quality appear in their post-hearing brief to be part of their argument for why the equities weigh in favor of the affiliation, the court finds it more appropriate to consider these arguments as part of defendants' rebuttal case on likelihood of success.

### i. Efficiencies defense

The <u>Merger Guidelines</u> recognize that "a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products." <u>Merger Guidelines</u> § 10. A merger will not be deemed unlawful "if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market." <u>Id.</u> However, the <u>Merger Guidelines</u> also advise that "[t]he greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies," and that "[e]fficiencies almost never justify a merger to monopoly or near-monopoly." <u>Id.</u>

Although the Supreme Court has not sanctioned the use of an efficiencies defense in a Section 7 case, most lower courts recognize the defense. <u>See</u> <u>Heinz</u>, 246 F.3d at 720; <u>see also</u> <u>Univ. Health</u>, 938 F.2d at 1222 ("We conclude that in certain circumstances, a defendant may rebut the government's prima facie case with evidence showing that the intended merger would create significant efficiencies in the relevant market."); <u>Tenet Health</u>, 186 F.3d at 1054 ("[A]lthough [the defendant's] efficiencies defense may have been properly rejected by the district court, the district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger."). However, courts only consider efficiencies that are verifiable and merger-specific, and it is incumbent upon the court to "undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those efficiencies represent more than mere speculation and promises about post-merger behavior." <u>H & R Block</u>, 2011 WL 5438955, at *44 (quotation marks omitted); <u>see also</u> <u>Univ. Health</u>, 938 F.2d at 1223 (explaining that "a defendant [cannot] overcome a presumption of illegality based solely on speculative, self-serving

assertions"). Moreover, "[h]igh market concentration levels require proof of extraordinary efficiencies . . . and courts generally have found inadequate proof of efficiencies to sustain a rebuttal of the government's case." H & R Block, 2011 WL 5438955, at *44 (quotation marks omitted); see also ProMedica, 2011 WL 1219281, at *57 ("No court in a 13(b) proceeding, or otherwise, has found efficiencies sufficient to rescue an otherwise illegal merger.").

### ii. Claimed efficiencies

Defendants claim that the proposed merger will generate substantial efficiencies in the form of (1) annual, recurring cost savings based on the consolidation of clinical operations, and (2) one-time capital avoidance savings. See DX0366 ¶ 4. Defendants "expect cost savings produced by the transaction to flow through [to customers] in the form of reduced prices, or alternatively, to exert downward pressure on future price increases that in the absence of the transaction would be necessary to offset rising costs." Id. ¶ 9. The FTC is more skeptical and argues that defendants have failed to rebut its prima facie case because the claimed efficiencies are speculative, unreliable, and not merger-specific.

The court has thoroughly reviewed the claimed efficiencies in this case and the expert testimony from both sides and is compelled to conclude that, at least for the purpose of these proceedings, defendants have failed to present sufficient proof of the type of "extraordinary efficiencies" that would be necessary to rebut the FTC's strong prima facie case. See H & R Block, 2011 WL 5438955, at *44. In making this decision, the court is mindful of its limited role in these proceedings and expresses no opinion on the ultimate merits of the proposed merger. See, e.g., Whole Foods, 548 F.3d at 1035 (explaining that "a district court must not require the FTC to prove the merits" of its underlying antitrust claim). The court has determined, however, that the FTC has

33

raised serious and substantial questions about the proposed merger that require further study and deliberation, Univ. Health, 938 F.2d at 1218, and that it is appropriate for the court to preserve the status quo until the FTC can perform this function, Food Town, 539 F.2d at 1342. Defendants' efficiencies defense, which is supported by expert testimony, may ultimately prevail after further consideration, but at this point it is not enough to rebut the FTC's case for a preliminary injunction, especially where the FTC has vigorously and cogently criticized this defense with expert testimony of its own. See Whole Foods, 548 F.3d at 1048 (Tatel, J., concurring) (noting that the court "trench[es] on the FTC's role when [it] choose[s] between plausible, well-supported expert studies"). Indeed, the court concludes that the conflicting expert evidence in this case demonstrates the need for further substantive review by the FTC at the trial on the merits.

The court now turns its analysis to the specific efficiencies claimed by defendants. At the outset, the court notes that it is not directly relying on the "Business Efficiencies Report" prepared for defendants by FTI Healthcare, see PX0001, but instead has reviewed the expert reports and testimony of Dr. Manning, defendants' economics expert, who evaluated the claimed efficiencies in the FTI report within the framework of the Merger Guidelines, see DX0012 ¶ 4; DX0366 ¶ 3; Tr. at 811.

### (1) Cost savings from consolidation

Although her analysis is still ongoing, at the time of the hearing, Dr. Manning had identified approximately $15.2 to $15.6 million in annual, recurring cost savings that, in her opinion, are cognizable under the Merger Guidelines, resulting from the proposed consolidation of clinical operations in the service lines of trauma, oncology, cardiology, and women's and children's

services, as well as savings attributable to clinical and operational effectiveness.[17] Tr. at 814, 819-21; DX0366 ¶ 4, Table 1; see also Merger Guidelines § 10 ("Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service."). On the other side, plaintiff's expert, H. Gabriel Dagen, has concluded that "a substantial portion of the claimed cost savings are overstated, are speculative, and have been inadequately substantiated to allow for verification," and that "a significant portion of the claimed efficiencies could be achieved unilaterally without the proposed merger and thus, are not merger specific." PX2502 ¶ 22. This is due in large part to the fact that "defendants do not have well-developed, let alone final, plans with respect to service-line consolidations," making them "highly speculative." Id. ¶ 36; see also Tr. at 747-49 (CEO of RMH admitting that "no final decisions have been made about which, if any, clinical service lines may be consolidated following the merger" and that "[i]t's possible that no service lines will ever be consolidated after the merger").

Given this conflicting expert testimony and the uncertainty surrounding whether, and to what extent, the proposed consolidations would take place after the merger was consummated, the court cannot find that this portion of defendants' efficiency defense is sufficient to rebut the FTC's case. An example may help illustrate the point. Defendants claim that they can generate $3.2 to $3.6 million in annual savings by consolidating trauma services at one hospital, mostly from eliminating redundancies such as on-call physicians, trauma center staff, and helicopter crews. See DX0366 ¶¶ 4, 26-46. In reaching this conclusion, defendants' expert did a thorough job of identifying

---

[17]According to Dr. Manning, "[c]linical effectiveness primarily deals with the application of best practices and protocols and administration of those clinical areas across the broader hospital." Tr. at 820.

possible cost savings, determining the feasibility of combining services at one location in terms of patient volume, and explaining why defendants would have the "economic incentives" to consolidate their trauma services. Id. ¶¶ 26-46, 51-52. However, the fact that it might make business sense to consolidate trauma services after the merger does not guarantee that the identified efficiencies will be attained. See Merger Guidelines § 10 ("[E]fficiencies projected reasonably and in good faith by the merging firms may not be realized."). As plaintiff's expert explains, "the consolidation of trauma services will be very difficult and requires a great deal of further study," but defendants "have not yet even studied the feasibility of consolidating trauma services." PX2502 ¶¶ 63-64; see also Tr. at 599 (CEO of SAMC explaining that they had not started the process of developing a plan of consolidation because they cannot look at proprietary data and "quite frankly, why do we start to spend the money not knowing where we're at with this process with the FTC"). In fact, there has not even been a decision made on where the consolidated trauma center would be located because "it was so charged politically that [they] decided to put a TBD[18] on it for this time." PX0216 at 200. There are additional hurdles as well, including possible physician resistance and regulatory approval. PX2502 ¶¶ 64-65; see also PX2507 ¶ 4 (noting that "numerous cultural, financial, regulatory and other practical issues will affect whether defendants actually pursue the alleged efficiencies"); Tr. at 757 ("[E]ven if trauma consolidation ultimately occurs, it would take 24 to 36 months from the date the merger is consummated before any such actual consolidation would occur.").

The other proposed consolidations are similarly speculative at this point, as no specific plans have been made on how or when any of these service lines would be consolidated to achieve the

---

[18]The term "TBD" stands for "[t]o be determined." PX0216 at 199.

claimed efficiencies.  See Tr. at 759 ("[W]e have not made any decisions on the relocation or location of our clinical areas."); PX2503 ¶ 27 ("Combining and consolidating hospital services is a challenging endeavor, and there are many associated risks to effective implementation of clinical service consolidations, including community resistance, disparate physician cultures, and associated services that may rely on having that service operational in the hospital.").

Because of the uncertainty regarding consolidation of service lines, the court cannot find with any degree of confidence that defendants have identified "cognizable efficiencies [that] likely would be sufficient to reverse the merger's potential to harm customers in the relevant market." Merger Guidelines § 10.  Accordingly, defendants have not successfully rebutted the FTC's case by pointing to possible savings from consolidation of service lines.

### (2) One-time capital cost avoidance

Defendants also argue that the merger would allow them to avoid certain one-time capital expenditures that they claim will be necessary if the merger does not go through.  Dr. Manning identified in her report $114.1 million in cognizable capital avoidance savings, primarily derived from the alleged elimination of the need for construction of a new bed tower at SAMC.  DX0366 ¶ 7, Table 2.  Similar to the claimed annual savings, the court finds that the asserted capital avoidance savings are not sufficiently certain at this time to successfully rebut the FTC's case.[19]

The majority of the purported savings from capital avoidance, or $100.7 million, is associated with the potential that, after the merger, SAMC would no longer be required to construct a bed tower in order to accommodate additional private rooms.  See id. ¶¶ 92-95.  However,

---

[19]Because the court finds that the capital avoidance savings are not cognizable, the court does not address the contention of plaintiff's expert that "it is incorrect to consider all of the alleged capital avoidance items as one-time immediate or lump-sum savings."  PX2502 ¶ 27.

defendants' expert admits that the project was placed on hold in 2008, and that "some of the claimed avoided capital spend . . . currently does not appear in the Parties' capital budgets." Id. ¶¶ 76, 92. In fact, the chief financial officer for OSF Healthcare System acknowledged, when asked about the bed tower, that it was far from certain whether they would proceed with that project:

> I don't know if I want to imply that if the merger doesn't go through, we would have to build a bed tower. It would be very difficult to build a bed tower. We would have to evaluate all over again and start from scratch. I wouldn't say there would be any plans for a bed tower if the merger didn't go through. We would have to start over and see what we would do.

PX0211 at 221. Moreover, because it is unclear at this point what services would be consolidated and where those services would be located, it is difficult to predict the post-merger patient volume at SAMC or evaluate whether there would still be some need for additional bedding at SAMC. See PX2502 ¶ 36 ("Some consolidation likely would involve moving services (and patient volume) from Rockford Memorial to OSF St. Anthony. Thus, if OSF St. Anthony requires a bed tower today, then I believe that it would still require a similarly sized bed tower after the merger." (footnote omitted)). For all these reasons, the court finds that the projected savings based on the bed tower are too speculative at this point to properly counteract the presumption of illegality based on the FTC's prima facie case.

The remainder of the alleged capital avoidance savings suffer from similar infirmities. For example, Dr. Manning found that the merger could save defendants $2.4 million as a result of not having to replace aged Intensity Modulated Radiation Therapy (IMRT) equipment, and $4 million based on SAMC not having to purchase a da Vinci Robot, even though there are no current plans to purchase a da Vinci Robot. DX0366 ¶ 7, Table 2; Tr. at 865-68. However, these potential savings are based on a successful consolidation of service lines, the scope of which is uncertain at

38

the present time, and therefore it is possible that this equipment still would need to be purchased even if the merger was consummated. See PX2502 ¶ 47 ("Since the vast majority of clinical services offered by the combined entity will remain at separate hospitals post-merger, if OSF St. Anthony were going to need a da Vinci Robot today, it is very likely that it would need one post-merger."). Likewise, the $7 million in identified savings based on replacement cost of a trauma helicopter, see DX0366 ¶ 7, Table 2, is dependent on the successful consolidation of trauma services, and even if there was a consolidation, it is unclear whether defendants could, in fact, eliminate one helicopter post-merger, see PX2502 ¶ 67 ("I have seen no evidence that defendants will in fact be able to eliminate one helicopter. Thus, defendants' claimed one-time helicopter cost avoidance is speculative.").

Based on the foregoing, the court cannot find that the claimed efficiencies resulting from avoidance of one-time capital expenditures are cognizable, and thus, defendants have failed to present "extraordinary efficiencies" that are sufficient to rebut the FTC's case. H & R Block, 2011 WL 5438955, at *44.

### (3) Clinical effectiveness / best practices

Defendants also claim that the merger will allow them to save approximately $7.8 million per year based on clinical effectiveness, or the adoption and sharing of "best practices" among the two hospitals, after the consolidation of service lines. DX0366 ¶ 74. However, plaintiff's experts uniformly agree that this claimed efficiency is not cognizable because the sharing of best practices is not merger-specific. See PX2502 ¶ 84 ("[D]efendants have completely failed to demonstrate why such cost savings can only be achieved through this merger."); Tr. at 132-34 (noting that "there are many different ways to identify best practices" without merging, and that defendants have been

"proactive in joining programs that are available" to help identify and implement best practices); see also Tr. at 631 (admitting the SAMC would continue implementing programs aimed at reducing costs regardless of the merger); Tr. at 767 (admitting that RMH would continue implementing best practices regardless of the merger). Based on this evidence, the court cannot say that the projected savings from the implementation of best practices are certain to occur or that they can only be achieved through the proposed merger. See Rockford Mem'l, 717 F. Supp. at 1291 ("[T]he standardization of clinical practices does not require a merger."). Accordingly, these alleged efficiencies do not rebut the FTC's strong prima facie case.[20]

### iii. Improved quality and other community benefits

In a related argument, defendants maintain that the proposed merger will lead to improved quality of care and provide other benefits to the Rockford community, such as allowing the merged entity to develop "Centers of Excellence," increasing defendants' ability to attract and recruit specialists and subspecialists, and enabling them to develop a graduate medical residency program. See Doc. 176 at 18-19. Plaintiff contests each of these claims and argues that they are unsubstantiated, speculative, and not merger-specific.

Initially, the court notes that these claimed benefits are, according to defendants' own arguments, dependent on attaining the cost savings from efficiencies discussed above. In other words, defendants argue that these are some of the benefits that would be possible because of the savings discussed above. Thus, to the extent that the proposed savings are speculative or otherwise

---

[20]Even if the court were to credit some of the efficiencies that defendants hope to achieve from consolidation of service lines, avoidance of capital expenditures, and implementation of best practices, the court would still find that defendants failed to rebut the FTC's prima facie case as there is no definitive evidence that these cost savings would be passed on to the consumer.

not cognizable, these secondary benefits are likewise speculative or not cognizable and therefore insufficient to overcome the FTC's case.

However, even if the court independently considers these arguments, the court finds that the FTC has presented sufficient evidence to raise serious and substantial questions as to whether these potential benefits outweigh the potential harm to consumers from the presumptively anticompetitive merger. For instance, there is conflicting evidence from the experts in this case regarding whether increased quantity of procedures can lead to improved quality of care, and although it seems that there is some support for such a theory under certain circumstances, it is not clear that those conditions would be present in this case if the merger were consummated. Compare DX0366 ¶¶ 16-25 (arguing that there is "a positive relationship between increased volumes of procedures at hospitals and improved clinical outcomes") with PX2503 ¶¶ 17-21 (concluding that "the empirical literature provides no basis to believe that the proposed acquisition will increase quality"); see also Tr. at 116-17 (explaining that a merger would only lead to higher volumes of procedures "if the hospitals consolidate services," and further that "only changing hospital volume without changing physician volume" may not provide the anticipated level of improvement). Likewise, it is unclear that defendants will be able to develop any "Centers of Excellence" as a result of the merger, and in any event, they may be able to achieve these designations independent of the merger. See Tr. at 129-31.

As for defendants' claims that the merger will enable them to be better able to recruit specialists and subspecialists, this argument is somewhat belied by their history of successful recruitment of specialty physicians. See Tr. at 142 (explaining that RMH has successfully recruited about 20 subspecialists in the past year and "have excellent representation in essentially all of the

medical specialties and subspecialties"). Moreover, plaintiff's expert testified that there is no "empirical evidence from the . . . literature that mergers facilitate recruitment of specialists," and that the population of an area is really the "key factor" to recruitment because "specialized physicians need a larger population base to support their practices." Tr. at 140-41; see also PX2503 ¶ 40 ("The claim that this acquisition will boost recruitment of specialists and subspecialists is highly speculative.").

Likewise, it is not clear that defendants' goal of developing a residency program would be sufficient to counteract the presumption of illegality. See PX2503 ¶¶ 36-37 (concluding that "[d]efendants' plans to launch residency programs post-acquisition are so highly speculative that they cannot be credited," as there is "no funding" allocated for this purpose and "no plans" for how these programs would be developed or implemented, and that any "residency programs would likely have little or no effect on clinical quality"). Moreover, "a merger or acquisition is not necessary to implement graduate medical education programs," but rather can be attained by implementing a joint residency program. Id. ¶ 38.

Overall, defendants should be commended for having the desirable goals of improving patient quality of care, developing institutional excellence and expertise, attracting specialized physicians to Rockford so that more and more health care services can be obtained locally, and providing educational opportunities to medical students. However, as detailed above, the court is unable to declare that these goals would be realized with, and only with, the proposed merger, or that these claimed benefits are sufficient to overcome the FTC's compelling prima facie case. See Heinz, 246 F.3d at 725 ("[T]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." (quotation marks omitted)); see also Phila. Nat'l Bank, 374 U.S.

at 371 (noting that a merger that substantially lessens competition "is not saved because, on some ultimate reckoning of social or economic debits or credits, it may be deemed beneficial").

### 4. Summation as to Likelihood of Success

Because the FTC has properly established the relevant market in this case and made a compelling prima facie case, which defendants were unable to successfully rebut, the court determines that the FTC has demonstrated a likelihood of success on the merits of its claim under Section 7 of the Clayton Act by raising "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." Univ. Health, 938 F.2d at 1218.

### B. Balance of Equities

"Although the FTC's showing of likelihood of success creates a presumption in favor of preliminary injunctive relief, [the court] must still weigh the equities in order to decide whether enjoining the merger would be in the public interest." Heinz, 246 F.3d at 726. In doing so, the court uses a "sliding scale" approach. Elders Grain, 868 F.2d at 903. "The equities will often weigh in favor of the FTC, since the public interest in effective enforcement of the antitrust laws was Congress's specific public equity consideration in enacting the provision." Whole Foods, 548 F.3d at 1035 (quotation marks omitted); see also Arch Coal, 329 F. Supp. 2d at 116 ("Because the public interest in effective enforcement of the antitrust laws is of primary importance, a showing of likely success on the merits will presumptively warrant an injunction."). In addition, "the FTC need not show any irreparable harm, and the private equities alone cannot override the FTC's showing of likelihood of success." Whole Foods, 548 F.3d at 1034-35 (quotation marks omitted). "No court

43

has denied relief to the FTC in a 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits." ProMedica, 2011 WL 1219281, at *60.

Based on these standards, the court finds that the equities weigh in favor of granting the injunction. In addition to the presumption in favor of preliminary relief, see Heinz, 246 F.3d at 726, the court finds it significant that the difficulty of "unscrambl[ing] merged assets" often precludes "an effective order of divestiture," FTC v. Dean Foods Co., 384 U.S. 597, 607 n.5 (1966). On the other side, despite their obvious desire to proceed with the merger immediately, defendants admit that the efficiencies they hope to gain can be achieved whenever the merger is allowed to proceed, even if that does not occur until after the FTC makes its final ruling. See PX4023 at 91-95; see also ProMedica, 2011 WL 1219281, at *60 (noting that "if the benefits of a merger are available after the trial on the merits, they do not constitute public equities weighing against a preliminary injunction"). Moreover, neither hospital is financially at risk of failing in the interim period. See Tr. at 435 ("[A]ll three hospitals in Rockford are financially viable.").

In determining that the equities weigh in favor of the FTC, the court has considered defendants' arguments but finds that they do not outweigh the public's interest in effective enforcement of the antitrust laws. For example, as discussed in more detail above, defendants claim that several efficiencies and pro-consumer benefits can be accomplished only with the merger. Although these might be considered public equities, the court has already found them to be too speculative at this point, and therefore, on balance, they cannot outweigh the public equities in favor of preliminarily enjoining the merger. Likewise, defendants' argument that the economic climate in Rockford cannot support three hospitals is rejected because defendants have not shown that the merger would lower prices, whereas the FTC has shown that the merger would likely lead to higher

prices. Thus, to the extent the court considers the economic realities of Rockford, this factor actually weighs in favor of granting the injunction. Finally, defendants' claim that the merger is essential to meet the challenges of healthcare reform is inherently difficult to evaluate, but it appears to be contradicted by defendants' own financial projections, which show that defendants expect to remain profitable even as healthcare reforms begin to take effect. See PX2501 ¶¶ 19, 22.

### III. CONCLUSION

After a thorough review, the court concludes that the FTC has demonstrated a likelihood of success on the merits, and that the equities weigh in favor of granting a preliminary injunction. Accordingly, plaintiff's motion for a preliminary injunction pursuant to section 13(b) of the FTC Act, 15 U.S.C. § 53(b), is granted in its entirety. Defendants and their parents, affiliates, subsidiaries, or divisions thereof are hereby enjoined and restrained from acquiring each other's assets or other interests and are directed to return all confidential information received directly or indirectly from one another. Defendants are further directed to maintain the status quo until either (1) the completion of all legal proceedings by the FTC challenging the acquisition, including all appeals, or (2) further order of the court, including upon the request of the FTC before the completion of such legal proceedings.

Date: April 5, 2012                                    ENTER:

                                                       _____
                                                       FREDERICK J. KAPALA
                                                       District Judge